2017 IL App (2d) 141241
No. 2-14-1241
Opinion filed June 23, 2017

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 13-CF-1600 |
| CALVIN JOHNSON, | ) ) | Honorable Kathryn E. Creswell, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BURKE delivered the judgment of the court, with opinion.
Justice Spence concurred in the judgment and opinion.
Justice Hutchinson concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1    Following a bench trial in the Du Page County circuit court, defendant, Calvin Johnson, was convicted of criminal sexual assault (720 ILCS 5/11-1.20(a)(1) (West 2012)), aggravated domestic battery (720 ILCS 5/12-3.3(a-5) (West 2012)), aggravated battery (720 ILCS 5/12-3.05(c) (West 2012)), and two counts of unlawful restraint (720 ILCS 5/10-3(a) (West 2012)).   He was sentenced to six years' imprisonment for criminal sexual assault and four concurrent terms of 30 months' probation, including 160 days in jail, for the other offenses.   He appeals, contending that (1) he was not proved guilty beyond a reasonable doubt; and (2) the trial

court committed plain error by requiring him to submit to a sex-offender evaluation when he was subject to a mandatory prison sentence.   We affirm.

¶ 2    Defendant had been married to C.J. for 19 years and they had three children together. However, the couple had experienced "rough patches" and had separated twice.   In late February 2013, C.J. moved out of the family's apartment.

¶ 3    Defendant and C.J. communicated periodically throughout February and March 2013. They spoke over the phone and in person.   Defendant wanted to reconcile, but C.J. did not.   They often engaged in heated arguments.   Defendant left angry and threatening messages on C.J.'s voicemail.   By the end of March, both parties had changed their phone numbers.

¶ 4    However, defendant also sent roses to C.J. at her workplace and wrote her letters. Defendant sometimes met C.J. in the parking lot after she finished work.   C.J. testified that encountering defendant at her workplace made her nervous, to the point that she began walking out of the building with a coworker, Latrina Martin.   Martin would wait to see if defendant's car was in the parking lot before going home.

¶ 5    Sometime in late March, defendant went to C.J.'s workplace on a night when she was working the late shift.   He approached her in the parking lot and asked to talk in the car.   She initially refused, but changed her mind because she was nervous and did not want to be embarrassed.   Martin assured C.J. that she would not leave until she was sure that C.J. was okay.

¶ 6    C.J. testified that defendant told her that she would be served with child-support papers. She said that she did not care and was filing for divorce, which made him mad.   When defendant saw C.J.'s coworkers, he said, "You got your fucking cheerleaders with you.   ***   [W]hat the fuck are they looking at, *** you my wife.   ***   I'll take you out and make a scene."

¶ 7    Defendant stepped out of the car and told Martin, "[T]his is my fucking wife. *** I never hit my wife." Martin testified that he said that he could do what he wanted. When C.J. got back in the car, she was crying because she was so embarrassed. Defendant said, "[C]an nobody [*sic*] stop me from getting to you. [Y]ou are my wife. No police, no coworkers." He got out of the car and said that he would never go to her workplace again.

¶ 8    C.J. filed reports with the Hillside and Oak Brook police departments. She sought an order of protection the following Monday, but her request was denied.

¶ 9    On April 11, 2013, C.J. was getting into her car to drive home from work. Martin was not working that night. C.J. heard a knock on the passenger-side window. It was defendant. According to C.J., defendant got into the car and said, "[B]itch, I'm trying to talk to your ass for four months." He held a black bag and pulled from it a white sock with a knife inside. Defendant said, "[S]hut the fuck up, bitch. I will kill your ass right now." Defendant then pulled from the bag a white bag with a gun in it. He did not pull the gun all the way out of the bag, but C.J. could see the silver handle.

¶ 10    Defendant returned the gun to the bag and held the knife, which he had pulled out of the sock. He told C.J. that he would kill her if she made a scene. He directed C.J. to drive to a motel. She did not want to go, and initially drove past it, but defendant forced her to turn around, saying that he would stab her if she made a scene. She turned around and pulled into the entrance of a Motel 6.

¶ 11    C.J. resisted going into the motel. As a black truck pulled up, she raised her voice, hoping to attract attention. Defendant said that she was making a scene and that he was going to stab her. He said that he had another gun in his pants and would kill her if she tried to run. They "tussled" over her purse.

¶ 12    They eventually entered the motel.  C.J. waited in the lobby while defendant talked to the desk clerk.  At one point, C.J. tried to walk out.  Defendant grabbed her arm and told her to get back inside or he would kill her.

¶ 13    Earnest King, the desk clerk, testified that as defendant checked in King heard someone crying from the east side of the building.  He saw a woman enter from that side, but he did not hear her crying anymore.  During the transaction, defendant stepped away and walked to where the woman was going back outside.  King did not know what was said.  When defendant returned to the desk, King asked if everything was alright and defendant said that everything was fine.

¶ 14    Defendant and C.J. drove to the west side of the building and went into a room.  C.J. initially sat on the bed with her coat on while defendant paced around the room.  Defendant said that he just wanted to talk to her.  He seemed less angry than before.  He asked her why she would not come home.  When she said that she was not going home, his mood changed.  He called her a bitch.

¶ 15    Defendant said that he wanted "closure."  He pulled her up off the bed and took off her coat.  He grabbed her arms and took off her shirt, while she kept saying "no."  Defendant took off his pants and removed C.J.'s clothes except for her underwear.  He laid her down on the bed, saying that he missed his wife.  He began kissing her.  She kept saying "no" and crying.  She tried to push him off her but he was too strong.

¶ 16    Defendant put her arms toward the top of the bed and had intercourse with her.  C.J. "just laid there" and could not push him away.  She was limp, just wanting it to stop.  Afterward, defendant got dressed and told C.J. to wash up in the bathroom.

¶ 17    Defendant's demeanor changed again.   He told her that if she ever needed anything she should call him.   They left the motel and drove back to the parking lot of C.J.'s workplace. When they arrived, C.J. retrieved her purse from the trunk.   Defendant returned to his car and they drove away in opposite directions.

¶ 18    C.J. noticed that she had missed several calls from her sister, Monique, and C.J.'s daughter Sierra.   C.J. would typically call Monique when she finished her late shift.   Monique testified that she became worried when she did not hear from C.J. after her shift on April 11.

¶ 19    When C.J. arrived at Monique's home, Monique could tell that she was upset and had been crying.   C.J.'s hair was messed up.   C.J. did not tell Monique what happened.   According to Monique, C.J. still looked upset the following morning, but she did not tell Monique anything before she left for work.   On her way, C.J. started crying and pulled over.   She called Monique and told her what happened.

¶ 20    C.J. then drove to Sierra's house.   Sierra testified that C.J. was crying and was "kind of stiff."   C.J. then told Sierra and her husband what had happened.   Sierra's husband went outside and flagged down a police officer.   C.J. was taken by ambulance to Elmhurst Hospital.

¶ 21    Oak Brook police detective Jason Wood met C.J. at the hospital.   He testified that she was in a "very emotional state," crying, shaking, and "extremely upset."   C.J.'s daughter Quinterra'-+ also saw her at the hospital.   She said that her mother's eyes looked glassy and that she was shaking.

¶ 22    Nurse Denise Trimble conducted a sexual-assault exam.   The exam showed a right shoulder injury, a bruise on her right hand, and a slight tear in the perineum area of her vagina. Trimble opined that the injuries were consistent with C.J.'s story and with sexual trauma.

¶ 23    On April 13, police executing a search warrant at defendant's home found a clean butcher knife matching C.J.'s description of the knife defendant used during the incident.

¶ 24    Defendant testified that in late March he spoke with C.J. at her workplace. They discussed her paying him child support, but he did not serve her with child-support papers. C.J. became irate because she did not want child support deducted from her paycheck. At one point, someone walked past the car and looked at defendant. Believing that this was rude, he asked C.J. who it was. She said, "[O]h, my God, you're going to embarrass me." Defendant responded, "[N]o, they're your friends. Please ask them to walk away. This is embarrassing to both of us."

¶ 25    Defendant got out of the car and said, "[t]here's nothing going on here. I'm not going to hurt this woman. I never laid a hand on a woman never in my life."

¶ 26    Defendant testified that on April 11, 2013, he again met C.J. at her workplace. Defendant got into her car. He suggested that they go somewhere and talk. He did not tell her where to drive. They ended up at a Motel 6 that they had visited in the past. They sat in the car for about 20 minutes, reminiscing. The mood was somber. Defendant went in to request a room while C.J. stayed outside. Defendant thought that he heard her come in, so he yelled at her to get the license plate number of her car, but she did not hear him. Defendant went out and wrote the number on his hand. They entered the room and had consensual sex. Defendant never displayed a weapon or threatened her.

¶ 27    The trial court found defendant not guilty of four counts alleging stalking and aggravated stalking. However, the court found defendant guilty of criminal sexual assault, aggravated domestic battery, aggravated battery, and two counts of unlawful restraint. The court specifically found C.J.'s testimony credible and defendant's testimony not credible. The court noted evidence of the parties' contentious relationship in the months before this incident, and the testimony of

several witnesses that C.J. was crying and upset the day after. In light of this evidence, the court did not find credible defendant's testimony that she voluntarily accompanied him to a motel and had consensual sex.

¶ 28    The court noted that both defendant and C.J. were impeached to some degree with inconsistent testimony at a May 2013 order-of-protection hearing. The court found this unsurprising, given that such hearings are often emotionally charged and that "testimony in those types of proceedings is often exaggerated." The court also observed that, when parties represent themselves, pertinent details are often omitted.

¶ 29    The court also observed that defendant's demeanor during cross-examination changed quickly, as C.J. had described. The court observed that defendant's tone and intensity changed instantly. He was "angry, aggressive, defiant and combative" with the prosecutor and tried to control the cross-examination.

¶ 30    The court ordered a presentence report, which was to include a sex-offender evaluation. The court set the matter for sentencing.

¶ 31    At sentencing, the court stated that it had considered the presentence report, including the sex-offender evaluation. The evaluation found that defendant was a pedophile. The evaluator also reported that defendant was dishonest during the evaluation and that the best way to manage the risk he posed was to place him in a secure setting. The court stated that it did not believe that defendant was a pedophile, but it commented on his attempts to "deceive" and "outsmart" the evaluator. After noting defendant's steady work history and lack of criminal history, the court stated that the "aggravation here is really just the facts of the case themselves, the nature and circumstances of what occurred." The court sentenced defendant to six years' imprisonment for

criminal sexual assault, to be followed by a term of 30 months' probation and 160 days in jail for the less serious offenses. Defendant timely appeals.

¶ 32 Defendant first contends that he was not proved guilty beyond a reasonable doubt. He contends that C.J.'s testimony was not credible, that she was impeached by inconsistent statements she made to the police and at the May 2013 order-of-protection hearing, and that his own testimony was more credible.

¶ 33 Where a defendant challenges on appeal the sufficiency of the evidence, the relevant question is whether, after viewing all the evidence in the light most favorable to the prosecution, a rational trier of fact could have found all the elements of the offense beyond a reasonable doubt. *People v. Collins*, 214 Ill. 2d 206, 217 (2005). A reviewing court may not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence, the credibility of the witnesses, or the resolution of conflicting testimony. *People v. Campbell*, 146 Ill. 2d 363, 375 (1992).

¶ 34 Here, C.J. testified clearly and consistently that defendant got into her car, threatened her, displayed a knife and a gun, and forced her to drive to a motel, where he forcibly had sex with her. The testimony of a single witness, if positive and credible, is sufficient for a conviction. *People v. Mister*, 2016 IL App (4th) 130180-B, ¶ 104.

¶ 35 Moreover, C.J.'s testimony was corroborated by other evidence. There was substantial evidence that defendant and C.J. had had a contentious relationship for several weeks prior to April 11, 2013. C.J. moved out and they were in the process of getting a divorce. They had arguments and defendant left angry messages on her voicemail. C.J. had consistently resisted defendant's attempts at reconciliation. Both parties had changed their phone numbers at least once.

¶ 36    C.J. testified about an argument that occurred in the parking lot of her workplace a few days before the incident in question.   Martin witnessed this altercation.   She testified that defendant said that C.J. was his wife and that he could do what he wanted.

¶ 37    Several witnesses, including Monique, C.J.'s daughters, and Wood, testified that they saw C.J. the day after the incident and that she was crying and extremely upset.   Trimble testified that the results of her examination of C.J. were consistent with "sexual trauma."

¶ 38    The trial court noted that defendant's demeanor while testifying corroborated C.J.'s testimony about his volatile temper.   The court described defendant's demeanor during cross-examination as "angry, aggressive, defiant and combative."

¶ 39    In light of this corroborating evidence, the trial court could reasonably credit C.J.'s testimony and reject defendant's testimony that, in the midst of a contentious divorce, he and C.J. calmly drove to a motel and had consensual sex.

¶ 40    Defendant identifies 10 points on which C.J.'s trial testimony was inconsistent with either her statement to police or her testimony at the May 2013 order-of-protection hearing.   The vast majority of these points are collateral.   The only one directly relevant to the offenses is the last: at trial, C.J. testified that she tried to push defendant off of her, while at the order-of-protection hearing she said that there was no struggle.

¶ 41    It is perhaps possible to harmonize the two statements, as one might not necessarily equate a push with a struggle.   Semantics aside, the trial court noted that both parties were impeached to some extent with their inconsistent testimony at the earlier hearing.   The court found the relatively minor inconsistencies unsurprising given the "emotionally charged" nature of order-of-protection proceedings and the fact that the parties appeared *pro se*.   In any event, minor inconsistencies in a party's testimony do not, of themselves, create a reasonable doubt of a defendant's guilt.   *People*

*v. Adams*, 109 Ill. 2d 102, 115 (1985). Given the relative overall strength of C.J.'s testimony and the substantial corroborating evidence, the relatively minor inconsistencies defendant raises did not require the trial court to reject her testimony.

¶ 42 Defendant next contends that the trial court erred by ordering him to submit to a sex-offender evaluation when he was to be sentenced to prison. Defendant concedes that he did not raise this issue in the trial court, but he asks us to consider it as plain error. To obtain relief under the plain-error rule, a defendant must first show "a clear or obvious error." *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). "In the sentencing context, a defendant must then show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *Id.* Under either prong, the defendant has the burden of persuasion. *Id.*

¶ 43 We hold first that defendant has shown a clear or obvious error. Section 5-3-2(b-5) of the Unified Code of Corrections provides as follows:

> "In cases involving felony sex offenses in which the offender is being considered for probation only *** the [presentence] investigation shall include a sex offender evaluation ***. In cases in which the offender is being considered for any mandatory prison sentence, the investigation shall not include a sex offender evaluation." 730 ILCS 5/5-3-2(b-5) (West 2014).

¶ 44 "The fundamental rule of statutory construction is to ascertain and give effect to the legislature's intent." *People v. Davison*, 233 Ill. 2d 30, 40 (2009). The best indication of that intent is the statutory language itself, which we give its plain and ordinary meaning. *Id.* Where the language is clear and unambiguous, we apply the statute as written without resort to aids of statutory construction. *People v. McChriston*, 2014 IL 115310, ¶ 15. The construction of a

statute is a question of law, which we review *de novo*. *DeLuna v. Burciaga*, 223 Ill. 2d 49, 59 (2006).

¶ 45   Here, defendant was convicted of criminal sexual assault, a nonprobationable Class 1 felony. 720 ILCS 5/11-1.20(a)(1) (West 2014); 730 ILCS 5/5-5-3(c)(2)(H) (West 2014). Thus, defendant was not being considered for "probation only," but instead was to receive a mandatory prison sentence. Thus, the statute's plain language provides that he should not have been required to submit to a sex-offender evaluation.

¶ 46   The State cites *People v. Hillier*, 392 Ill. App. 3d 66 (2009), *aff'd*, 237 Ill. 2d 539, for the proposition that ordering the evaluation was within the trial court's discretion. There, the court found that section 5-3-2(b-5) did not prohibit the trial court from ordering a sex-offender evaluation for a defendant who was not eligible for probation, and it saw "no reason to disallow a sex offender evaluation in nonprobationary cases if the trial court deems it helpful." *Id.* at 70.

¶ 47   *Hillier*, however, was decided prior to the most recent amendment to section 5-3-2(b-5). When *Hillier* was decided, that section read, "In cases involving felony sex offenses in which the offender is being considered for probation *** the investigation shall include a sex offender evaluation ***." 730 ILCS 5/5-3-2(b-5) (West 2008). In 2009, the statute was amended. The amendment added "only" after "probation" and added the last sentence providing that, where a defendant is eligible for any mandatory prison sentence, "the investigation shall not include a sex offender evaluation." Pub. Act 96-322, § 5 (eff. Jan. 1, 2010) (amending 730 ILCS 5/5-3-2(b)); see *People v. Guerrero*, 2011 IL App (2d) 090972, ¶ 69 n.5. Thus, when *Hillier* was decided, the statute did not specifically prohibit a trial court from ordering a sex-offender evaluation in a case where a defendant was subject to a mandatory prison sentence. Accordingly, *Hillier* did not authorize the trial court to order an evaluation here.

¶ 48    The State, in what defendant aptly describes as a "circuitous" argument, appears to contend that, because defendant received sentences of probation for the less serious convictions, a sex-offender evaluation was authorized.   This contradicts the statute's explicit language.   The statute provides for an evaluation where a defendant is being considered for "probation only" and prohibits one where a defendant is subject to "any" mandatory prison sentence.   730 ILCS 5/5-3-2(b-5) (West 2014).   Defendant here was subject to a mandatory prison sentence for the criminal sexual assault, and thus an evaluation was not permitted even though he was being considered for, and in fact received, probation for the less serious offenses.

¶ 49    We recognize the potential for confusion in cases such as this one, where defendant was sentenced to probation terms to be served consecutively to his prison sentence.   However, this does not permit us to depart from the statute's plain language.

¶ 50    Having found a clear or obvious error, we turn to whether defendant has met his burden of persuasion on either prong of the plain-error rule.   To some extent, defendant conflates the two prongs.   He explicitly invokes the second prong, asserting that the error denied him a fair sentencing hearing.   However, he also argues that, in light of the strength of the mitigating evidence, the sex-offender evaluation "prejudiced" him, *i.e.*, it might have affected his sentence. This is an argument under the *first* prong.   See *People v. Jackson*, 2013 IL App (3d) 120205, ¶ 23 (under first prong, defendant must show prejudice).   In fairness to defendant, we will address both prongs.

¶ 51    We begin with the second prong.   Although that prong applies where an error denied a defendant "a fair sentencing hearing" (*Hillier*, 237 Ill. 2d at 545), it is crucial to recognize that, for these purposes, only an extraordinarily serious error will render a proceeding "unfair."   Indeed, the supreme court has "equated second-prong plain error with *structural* error."   (Emphasis

added.) *People v. Clark*, 2016 IL 118845, ¶ 46. This does not mean that second-prong plain error is restricted to "the [six] types of structural error that have been recognized by the [United States] Supreme Court" (*id.*), but it does mean that the error nevertheless must be of a similar kind: an error " 'affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself' " (*Neder v. United States*, 527 U.S. 1, 8 (1999) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991))). Defendant does not show how the error here—a violation of a "purely statutory requirement," which resulted merely in the introduction of improper evidence—rises to that level. See *People v. Williams*, 2015 IL App (2d) 130585, ¶ 11 n.2. Thus, defendant has not met his burden of persuasion on the second prong.

¶ 52     We turn to the first prong. As noted, defendant argues that the evidence as a whole was such that the sex-offender evaluation might have affected his sentence. The State responds that the trial court did not rely on the evaluation in any substantive way.

¶ 53     We have found no case involving a trial court's consideration at sentencing of an unauthorized sex-offender evaluation. However, in *People v. Abdelhadi*, 2012 IL App (2d) 111053, we faced the analogous issue of whether to find plain error in a trial court's consideration of an improper factor in aggravation. We noted that, "[w]hen a trial court considers an improper factor in aggravation, the case must be remanded unless it appears from the record that the weight placed upon the improper factor was so insignificant that it did not lead to a greater sentence." *Id.* ¶ 18. Of relevance to that inquiry were "(1) whether the trial court made any dismissive or emphatic comments in reciting its consideration of the improper factor; and (2) whether the sentence received was substantially less than the maximum sentence permissible by statute." *Id.*

Because, in that case, we could not "determine how much weight was placed on that factor," we found plain error and remanded the cause for a new sentencing hearing. *Id.* ¶ 20.[1]

¶ 54 Here, by contrast, the record shows that the sex-offender evaluation did not influence the sentence. In light of the substantial mitigating factors, including defendant's complete lack of criminal history, the trial court imposed a sentence only two years above the statutory minimum. In explaining that slight increase above the minimum, the court stated that the "aggravation here is really just the facts of the case themselves, the nature and circumstances of what occurred." Indeed, defendant's conduct during the criminal sexual assault, threatening the victim repeatedly with a knife and a gun, was more than sufficient to justify a six-year sentence.

¶ 55 The court did reference the evaluation, but its comments were largely dismissive. The most damaging aspect of the evaluation was the conclusion that defendant was a pedophile. The court specifically rejected that conclusion. The court then discussed defendant's lack of cooperation during the evaluation, but only in the context of explaining that the evaluator's finding was "kind of what happens when the defendant attempts to deceive the evaluator." The court

---

[1] Like defendant's argument here, our decision in *Abdelhadi* was somewhat confused as to which prong of the plain-error rule we invoked. We stated that the issue implicated the second prong "because when a trial court considers erroneous aggravating factors in determining the appropriate sentence of imprisonment, the defendant's 'fundamental right to liberty' is unjustly affected, which is seen as a serious error." *Id.* ¶ 7 (quoting *People v. James*, 255 Ill. App. 3d 516, 531 (1993)). (Notably, in equating second-prong plain error with a merely "serious" error, we arguably did not abide the supreme court's equation with *structural* error.) However, in assessing whether the trial court's consideration of the improper factor might have led to a greater sentence, we seemed to be assessing whether the error was prejudicial under the *first* prong.

never indicated that it was increasing defendant's sentence because of his lack of cooperation with the evaluation. To the contrary, as noted, the court stated that the "aggravation here is really just the facts of the case themselves."

¶ 56 Although the trial court erred by ordering a sex-offender evaluation when defendant was subject to a mandatory prison sentence, it is clear that the evaluation did not affect defendant's sentence. Thus, defendant has not met his burden of showing first-prong plain error.

¶ 57 The judgment of the circuit court of Du Page County is affirmed. As part of our judgment, we grant the State's request that defendant be assessed $50 as costs for this appeal. 55 ILCS 5/4-2002(a) (West 2014); see also *People v. Nicholls*, 71 Ill. 2d 166, 178 (1978).

¶ 58 Affirmed.

¶ 59 JUSTICE HUTCHINSON, concurring in part and dissenting in part.

¶ 60 Although I agree with the majority that the evidence was sufficient to sustain defendant's convictions, I believe that a new sentencing hearing is necessary due to the erroneously ordered sex-offender evaluation. The majority concludes that "it is clear that the evaluation did not affect defendant's sentence." *Supra* ¶ 56. It is not so clear to me.

¶ 61 I understand that the judge did not specifically mention the evaluation when she discussed the aggravating factors, and I am mindful that the facts adduced at trial would have justified a sentence two years above the statutory minimum. However, I cannot overlook the degree to which the evaluation tainted these proceedings. Simply put, defendant's sentencing hearing was not fair.

¶ 62 In contravention of the relevant statute, defendant was forced to view 180 slides depicting children, teens, and adults, plus depictions of various deviant sexual behaviors. His responses to these images could serve no purpose other than to damage his prospects at sentencing. With that

in mind, he provided the same response to every slide. The evaluator noted that defendant "did not refuse to answer any questions but did not add much additional information." This led to findings that he was a pedophile and, for lack of a better term, a liar. Had the statute in question been followed, none of this would have taken place. But the statute was not followed, and the adverse findings from the evaluation were incorporated into the presentence report. The error was then compounded when the prosecutor made the evaluation a focal point of her argument during the sentencing hearing.

¶ 63    For instance, the prosecutor argued that defendant would say whatever he needed to say to get out of trouble. She asserted that defendant had presented himself as blameless and that he was instead blaming the victim. She pointed to the evaluation and argued that this was "textbook behavior for a sex offender like [defendant]." She then stated:

> "The evaluation classifies [defendant] as having obsessive compulsive personality disorder with histrionic and schizoid personality features. Now, reading the presentence report and the sex offender evaluation, it is evident that this defendant *** is manipulative, deceitful, and he is a vile individual whose dark side has, up until now, managed to escape detection for the most part.
>
> His presentence report and evaluation are riddled with inconsistencies because he can't keep his lies and rationalizations straight. So, he just defaults and says that everyone else is lying, except for him."

¶ 64    The evaluation continued to overshadow the sentencing hearing when, in an attempt to neutralize the damage from the prosecutor's scathing comments, defense counsel debated the import of the adverse findings. He argued that, beyond defendant's denial of the offense, nothing in the evaluation indicated dishonesty except for his responses to the slides.

¶ 65    Finally, when given an opportunity to address the court, defendant commented:

> "I am not a pedophile.   You can't put pictures in front of me and ask me to rate them on one level to ten.   I said it was disgusting, and I meant that.   I am not a pedophile. I am not going to answer a picture that shows a little girl in a bathing suit.   That's sick to me.   And if that's making me a guilty man because I refuse to answer it, then what's the test for?   Because I failed that test."

¶ 66    Before announcing defendant's sentence, the judge discussed the mitigating factors. Defendant had a full-time job and a long work history.   The judge observed that defendant's lack of criminal history was "remarkable," adding, "[i]t's not something the Court sees very often." The judge also recognized that defendant had performed charitable work through his memberships with the Shriners and the Masons.   She then discussed the adverse findings from the evaluation, specifically stating:

> "[Defense counsel] points out that the defendant is in a trick bag regarding the evaluation.   And I agree with that.   He basically put himself there.   No, I don't believe that [defendant] is a pedophile.   Okay?
>
> I think the history here, getting the big picture, there is certainly nothing to support that.   But that's kind of what happens when the defendant attempts to deceive the evaluator.   As indicated, his self-reporting ranking of sexual arousal to each of 180 slides indicates that he reports no sexual interest.
>
> It should be noted that [defendant] entered the same response for every slide.   That pattern of responding usually is an attempt by the client not to reveal his sexual interests. So, it's like he outsmarted himself and he is going to outsmart the evaluator, and the result

is something really awful. Looking at the big picture here, I mean, that's what I find. I find he was trying to outsmart the evaluator here."

¶ 67 The majority characterizes these comments as "largely dismissive," and notes that the judge "never indicated that [she] was increasing defendant's sentence because of his lack of cooperation with the evaluation." *Supra* ¶ 55. This reasoning seems flawed to me. The judge disregarded the statute and ordered the evaluation. The evaluation then loomed over the sentencing hearing like a dark cloud. That the judge did not discuss the evaluation's adverse findings as a reason for increasing defendant's sentence does not foreclose the possibility that it happened. I cannot join the majority in assuming that it did not.

¶ 68 Setting aside any further speculation as to the judge's thought process, I believe that the case should be remanded for a new sentencing hearing under both prongs of the plain-error rule. To obtain relief under the plain-error rule in the sentencing context, a defendant must show that either: "(1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *People v. Hillier*, 237 Ill. 2d 539, 545 (2010).

¶ 69 Regarding the first prong, the evidence at the sentencing hearing was closely balanced. The mitigating factors were significant. Defendant was facing a statutory four-year minimum term of imprisonment. The prosecutor requested a seven-year term. The judge imposed a six-year term. I believe that there is a reasonable chance that defendant would have received a lesser sentence if the statute had been followed and the evaluation had never taken place.

¶ 70 Turning to the second prong, which is the focus of defendant's argument, I have already made it clear that I believe that defendant was denied a fair sentencing hearing. The majority notes that second-prong plain error has been "equated" with structural error, and it dismisses

defendant's argument for failure to show how the violation of a "purely statutory requirement" rises to that level. (Internal quotation marks omitted.) *Supra* ¶ 51. What does that mean? That second-prong plain error can derive only from a constitutional violation? Our supreme court may endeavor to establish such a standard in the future, but, for now, there is no proscription against second-prong plain error arising out of a statutory violation.

¶ 71 To be clear, in *People v. Clark*, 2016 IL 118845, ¶ 46, our supreme court expressly rejected the notion that second-prong plain errors are restricted to the limited class of errors that have been deemed "structural." The emphasis must remain on fundamental fairness and the integrity of the judicial process. *Id.* ¶ 44 ("The next question is whether that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process."). The majority steers around the holding in *Clark* (s*upra* ¶ 51), maintaining that a second-prong plain error must still be "of a similar kind" as a structural error, meaning that it must be an error " 'affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself' " (*Neder v. United States*, 527 U.S. 1, 8 (1999) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991))). This might be accurate, but, even so, I fail to see how the statutory violation in this case did not affect "the framework within which the trial proceeds." Although I cannot say for certain that the sex-offender evaluation affected defendant's sentence, I believe that the error fundamentally altered the framework of the sentencing hearing. This was not "simply an error in the trial process itself."

¶ 72 Regardless of whether an improper consideration at sentencing is categorized as plain error under the first or second prong, it remains that "[s]entencing issues are regarded as matters affecting a defendant's substantial rights and are thus excepted from the doctrine of waiver." (Internal quotation marks omitted.) *People v. Wilbourn*, 2014 IL App (1st) 111497, ¶ 9. Here,

the judge acknowledged that she had "considered" the erroneously ordered sex-offender evaluation. I believe that this consideration violated defendant's substantial right to a fair sentencing hearing.[2]

¶ 73    At least two cases support the notion that the mere consideration of an improper factor at sentencing amounts to plain error, thus requiring a new sentencing hearing. In *People v. Abdelhadi*, 2012 IL App (2d) 111053, ¶ 3, the defendant was facing a prison term between 6 and 60 years for the offense of aggravated arson. Before imposing a 10-year term, the trial court stated: " "[s]pecifically in aggravation the Court has considered that the conduct caused by the defendant did, in fact, endanger the lives of individuals.' " *Id*. ¶ 4. On appeal, this court held that the trial court had improperly considered the threat of harm to others as an aggravating factor, as that factor was inherent in the defendant's offense. *Id*. ¶ 18. We noted that, although the 10-year sentence was substantially below the maximum sentence, it was also 4 years above the minimum sentence. Because the trial court's comments did not demonstrate how much weight was placed on the improper factor, we held that a new sentencing hearing was required. *Id*. ¶ 19.

¶ 74    A similar conclusion was reached in *People v. Sanders*, 2016 IL App (3d) 130511, *appeal denied*, No. 121247 (Ill. Nov. 23, 2016). The trial court in that case made the following comments during the sentencing hearing: "[A]mong other things, the defendant's conduct did cause or threaten serious harm. It may be inherent in the actual fact that he committed a murder, but it did occur, and that the defendant has a history of prior delinquency of criminal activity." (Internal quotation marks omitted.) *Id*. ¶ 6. The appellate court held that the trial court's

_____

[2] In that sense, it could be said that there were actually two errors in this case: the first occurring when the evaluation was ordered, and the second occurring when the evaluation was considered at sentencing.

improper consideration of a factor inherent in the underlying offense warranted a new sentencing hearing under the second prong of the plain-error rule, specifically finding that the trial court had "impinged on the defendant's right not to be sentenced based on an improper factor and affected his fundamental right to liberty." *Id*. ¶ 17.

¶ 75    Here, the adverse findings from the erroneously ordered sex-offender evaluation were considered to at least the same extent that the improper factors were considered in *Abdelhadi* and *Sanders*.    The majority surmises that *Abdelhadi* is distinguishable from this case because the erroneously ordered sex-offender evaluation "did not influence the sentence."    *Supra* ¶ 54.    But the majority misses the point.    Neither *Abdelhadi* nor *Sanders* turned on any determination as to whether the trial court's improper consideration influenced its determination of the sentence.    In both instances, it was the improper consideration itself that required a new sentencing hearing.    I believe that the same holds true here.

¶ 76    Before I conclude, I ask my colleagues to remember that "[t]he foundation of plain-error review is fundamental fairness." *People v. Lewis*, 234 Ill. 2d 32, 47 (2009).    We can twist and turn and strain to confine plain errors in a pair of tidy formulaic boxes, but, in the end, we must always remain mindful of our duties to ensure fundamental fairness and safeguard the integrity of the judicial process.    Accordingly, I dissent to draw attention to these duties.