2020 IL App (1st) 172696-U
No. 1-17-2696
Order filed May 11, 2020

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 8790 |
| | ) | |
| GREGORY BOOKER, | ) | Honorable |
| | ) | James Michael Obbish, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE HYMAN delivered the judgment of the court.
Justices Pierce and Walker concurred in the judgment.

**ORDER**

¶ 1     *Held:* Defendant's convictions of aggravated criminal sexual assault and criminal sexual assault affirmed, though trial court erred in allowing a nurse to testify about portions of the victim's hearsay statements that were unrelated to her medical treatment. The error neither amounted to plain error nor established a claim for ineffective assistance of counsel.

¶ 2     The State charged Gregory Booker with various sexual offenses based on his alleged sexual assault of K.M. The only issue at trial was consent. A nurse who performed K.M.'s sexual assault exam, testified about the exam procedure. Her testimony also included reciting the statements K.M. made to her during treatment. Booker's counsel objected to her testimony on

the ground that portions of K.M.'s statement were inadmissible hearsay. Booker renews this argument here, acknowledging that it was forfeited by trial counsel's failure to include it in a post-trial motion. But Booker asks us to excuse his forfeiture, either on plain error grounds or due to the ineffectiveness of his trial counsel. Though we agree that portions of K.M.'s statement were inadmissible, we find Booker failed in his burden to establish either plain error or ineffective assistance of counsel, and affirm.

¶ 3                                  Background

¶ 4      Gregory Booker shared a home with Mario and Jennifer. The victim, K.M., on occasion would visit the house because Jennifer's niece, Kristina, and K.M. were friends. K.M. testified that she and Kristina hung out there on the evening of March 8, 2013, drinking and smoking marijuana with others in the basement.

¶ 5      When K.M. became "tipsy," she went to sleep in Mario's room, where she usually slept when staying overnight. Some time during the night, K.M. woke up. Booker was inside her underwear, performing oral sex. She began kicking and pushing Booker, but he overpowered her, held her down, "and then he stuck his penis inside of [her] and raped [her]." Booker left the room, and K.M. stayed in bed waiting for Kristina. About a half-hour later, Kristina came in and K.M. told her what happened.

¶ 6      After Kristina confronted Booker, Mario asked everyone to calm down, and address the situation in the morning. The next day, K.M. and Kristina went to Kristina's house. Kristina's mother convinced K.M. to report the incident to police. K.M. also had a sexual assault exam.

¶ 7      Kristina testified that after K.M. went to Mario's room, she and others left for about 45 minutes to get food. Jermeisha Booker, who stayed behind, testified that she did not see anyone

go into Mario's room while the group was gone. When Kristina came back, K.M. "looked wrecked like she looked like she had fumbled around in the bed or something." Kristina confirmed that K.M. told her what happened, that Booker "tried to have sex with [K.M.],"

¶ 8     A certified sexual assault nurse, Kindra Nelson, testified that K.M. was bruised on her thigh and arms, suffered a hand abrasion, and had redness, tenderness, and lacerations on her vagina. K.M. told Nelson that injuries to her hand may have resulted from an altercation that took place between K.M. and Booker's daughter the morning after the assault. Nelson did routine DNA swabbing. The police concluded the sample was consistent with Booker's DNA.

¶ 9     Nelson then read from her notes, quoting K.M.'s statements to her:

> "I was asleep in bed with my T-shirt and panties on. He came in. Asked where [K.C.] was. I told her she went to the store. He left. I fell back to asleep. Then I woke up with him on top of me. He was rubbing me and stuff then he pulled my panties off one leg. I was pushing him off telling him to stop, but he took control over me."

Booker's counsel objected, and the trial court overruled the objection. Counsel did not renew the objection in a post-trial motion.

¶ 10     Booker testified in his own defense. He, K.M., and Kristina smoked marijuana together. Later, he went to the bathroom in hopes of taking a shower, and found K.M. and Kristina talking in the bathroom with the lights off. According to Booker, K.M. and Kristina asked if they could perform oral sex on him. Booker refused the offer because he had to use the restroom. After he did so, he went to his bedroom, laid down, and drifted in and out of sleep for several hours.

¶ 11     When he awoke, Booker went to Mario's room in search of a lighter and noticed K.M. lying in the bed. Finding no lighter in Mario's room or K.M.'s possession, Booker found one elsewhere. After smoking, Booker went back to Mario's room, and K.M. told him others had left

to get food. Booker asked K.M. if she would perform oral sex on him. K.M. refused, and he asked if he could perform oral sex on her. K.M. consented, took off her own underwear, and let Booker perform oral sex. Booker stopped, and then "start[ed] having sex with her," before realizing he was not wearing a condom. Booker stopped having sex and left to find a condom. Unable to find one, he decided not to go back to Mario's room.

¶ 12    Detective Dwayne Davis testified that he spoke with Booker soon after his arrest. Booker told Davis that he was in his room for most of the night. He went into Mario's room one time to get a lighter, and no one else was there. He woke up to Kristina accusing him of inappropriately touching K.M. He denied having sexual contact of any kind with K.M., and was released. After the DNA results from the sexual assault kit came back, Booker was again arrested. Davis confronted Booker with the DNA results, and Booker's story changed. He said that "when he went into his nephew Mario's bedroom to use the lighter that he must have been out of his mind" from smoking marijuana. Booker could not remember having sex with K.M. and "didn't know how his semen had gotten on her." Later the same day, Booker told an assistant state's attorney that K.M. had asked Booker to have sex with her.

¶ 13    The trial court found K.M. credible. As to Booker's defense, the court found "[his] story, his testimony, was extraordinary in its lack of credibility, lack of believability. It doesn't make common sense to anyone." The court also credited Davis's testimony that Booker initially denied having sex—consensual or otherwise—with K.M. The court found Booker guilty of one count of aggravated criminal sexual assault and two counts of criminal sexual assault. The court sentenced Booker to nine years in prison for the aggravated assault and a consecutive four years for the merged counts of criminal sexual assault.

¶ 14                              Analysis

¶ 15    Booker argues the trial court should not have admitted Kindra Nelson's verbatim recitation of K.M.'s hearsay statement made during her sexual assault examination. Booker contends that the statement did not fall within the medical treatment exception to the Illinois rules against hearsay, prejudicially corroborated K.M.'s account, and denied him a fair trial.

¶ 16    Booker acknowledges he forfeited his claim by having not included it in his post-trial motion. Instead, Booker asserts that we may review his claim under the plain error doctrine, which allows review of a forfeited claim when a clear or obvious error occurred, and either (i) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (ii) "that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Booker contends either prong applies, but first we must determine whether there is an error. *People v. Sebby*, 2017 IL 119445, ¶ 49.

¶ 17    Hearsay is a statement, other than one made by the declarant while testifying, "offered in evidence to prove the truth of the matter asserted." Ill. Evid. R. 801(c) (eff. Oct. 15, 2015). The parties do not dispute that K.M.'s statements to Nelson constituted hearsay; but, in a criminal sexual assault prosecution, a victim's statements are nonetheless admissible if given to medical personnel for diagnosis or treatment purposes, "including descriptions of the cause of the symptom, pain or sensation, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent." 725 ILCS 5/115-13 (West 2014).

¶ 18   We review the trial court's admission of evidence under Section 115-13 for an abuse of discretion. *People v Davis*, 337 Ill. App. 3d 977, 984, 989 (2003).

¶ 19   Booker contends that only a small portion of K.M.'s statement read by Nelson was related to medical diagnosis or treatment and the court's wholesale admission of the statement was an erroneous application of Section 115-13. Specifically, Booker argues K.M.'s statements about her clothes, how Booker removed her underwear, and that K.M. told Booker to stop had been admitted in error as irrelevant to K.M.'s medical treatment.

¶ 20   The Section 115-13 hearsay exception "generally encompasses statements regarding when, how, and where sexual acts occurred" in addition to causes of the victim's injuries. *People v. Freeman*, 404 Ill. App. 3d 978, 986–87 (2010)). Under the medical personnel exception, statements pertaining to the causes of injury and communicated to medical staff are admissible. *See People Davis*, 337 Ill. App. 3d 977, 990 (2003).

¶ 21   We agree with Booker, who concedes that his being on top of K.M., rubbing her, and taking control over her relate to Nelson's treatment. Specifically, we find the following portions admissible: "Then I woke up with him on top of me. He was rubbing me and stuff then pulled my panties off one leg. I was pushing him off *** but he took control over me."

¶ 22   We disagree, though, that the portion describing Booker's removal of K.M.'s underwear was inadmissible. In *Davis*, for example, we found the victim's description of the offenders' forceful removal of her clothes admissible as part of the ongoing narrative of the assault. See *Davis*, 337 Ill. App. 3d at 982, 990. Booker's removal of K.M.'s underwear provides insight into the degree of force necessary to accomplish the assault, information necessary to K.M.'s treatment. The rest of the statement, however, went beyond information necessary for treatment.

¶ 23    We find the following portions of K.M.'s statement to Nelson inadmissible: "I was asleep in my bed with my T-shirt and panties on. He came in. Asked where Kristina was. I told him she went to the store. He left. I fell back asleep." Descriptions of events before or after the assault fall outside of Section 115-13. *Davis*, 337 Ill. App. 3d at 990. We similarly find inadmissible the portion of K.M.'s statement explaining that she was "telling [Booker] to stop." While Nelson needed to know lack of consent to properly treat K.M., because, again, it speaks to the degree of force, we find K.M.'s description of the physical pushing of Booker sufficient. Anything K.M. said during the pushing did not add information needed to provide appropriate medical care. See *id.* (statements made by defendants to victim during course of assault inadmissible).

¶ 24    Having found error, we next determine whether we can excuse Booker's forfeiture under the plain error doctrine. To establish first-prong, Booker must show the evidence was closely balanced so that "the error alone severely threatened to tip the scale of justice." *Sebby*, 2017 IL 119445, ¶ 51. (citing *People v. Herron*, 215 Ill. 2d 167, 187 (2005)). Here, the evidence was not closely balanced because we do not confront a contest of credibility between two equally plausible narratives.

¶ 25    To determine whether the evidence was closely balanced, we undertake a "commonsense assessment" of the evidence, which we evaluate in its totality. *Sebby*, 2017 IL 119445, ¶ 53. A "contest of credibility" is the quintessential example of closely balanced evidence. *Id.*, ¶ 63. Booker argues that we have a contest of credibility because both K.M. and Booker testified about sexual contact and the case hinged on whether the sexual contact was consensual. We disagree.

¶ 26    Booker ignores a critical admonishment in *Sebby*: "We determined that *because both versions were credible*, the evidence was closely balanced." *Id.* Our supreme court found

dispositive that "the [state's witnesses'] testimony was largely consistent, but so was the testimony of the defendant and his witnesses." *Id.*, ¶ 61. Booker's own story shifted dramatically over time and the version he finally settled on suffers from serious contradictions by his own witnesses. Booker first told Detective Davis that he never had sex with K.M. Then he told Davis that he was out of his mind after smoking marijuana and did not remember the events of that night. Finally, he told Davis, and ultimately testified at trial, that the sex with K.M. was consensual. These are not "[m]inor inconsistencies." See *id.* A stark difference exists between no sex, forgotten sex, and consensual sex.

¶ 27 Additionally, Booker's witnesses contradicted the final version of his story in which he went to Mario's room and had consensual sex with K.M. Jermeisha Booker, for example, testified that she was awake in the basement when everyone else went to get food. She did not see anyone go into Mario's room and did not see Booker at all. This testimony flatly contradicts every version of Booker's story, each of which has him going into Mario's room for some purpose. Ashley Booker, who also testified for the defense, was not present during the time the assault took place and so could corroborate neither account. In short, this is not like *Sebby*, where two versions of the offense are equally plausible and uncontradicted.

¶ 28 Booker also contends, under the second prong, that the admission of K.M.'s hearsay statements was serious enough to deny his fundamental right to a fair trial. He argues that, in addition to prejudicing his defense, the State's reliance on Nelson's inadmissible testimony in its closing argument further undermined a fair trial. *People v. Henderson*, 2016 IL App (1st) 142259, ¶ 187 (citing *People v. Blue*, 189 Ill. 2d 99, 138 (2000) (fundamental right to be tried solely by "legal and competent evidence, uninfluenced by the bias or prejudice" of irrelevancy).

¶ 29    Second-prong plain error review, while not limited to structural errors set out by the U. S. Supreme Court, is reserved for errors "of a similar kind" that affect the "the framework within which the trial proceeds, rather than simply an error in the trial process itself." *People v. Johnson*, 2017 IL App (2d) 141241, ¶ 51. Violations of "purely statutory requirements" that result "merely in the introduction of improper evidence" do not rise to this level. *Id.* Booker's conception of second-prong plain error—that it covers any error which injects incompetent evidence, no matter how minor—would all but eliminate the requirement defendants preserve issues for our review.

¶ 30    Finally, Booker argues that we can excuse his forfeiture because counsel was ineffective for failing to preserve the claim. Again, we disagree. A successful ineffective assistance of counsel claim demonstrates "that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *People v. Manning*, 241 Ill. 2d 319, 326 (2011) (citing *Strickland v. Washington*, 466 U.S. 668, 688 (1984). Our supreme court has explained that analysis of *Strickland*'s prejudice prong functions the same as our analysis under the first prong of plain error review. *See People v. White*, 2011 IL 109689, ¶ 133. Having found the evidence not closely balanced, we similarly conclude that Booker suffered no prejudice, assuming (without deciding) counsel performed deficiently. As no exception excuses Booker's forfeiture, we affirm the trial court's judgment.

¶ 31    Affirmed.