2022 IL App (1st) 210506-U

No. 1-21-0506

Order filed November 14, 2022

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 8790 |
| | ) | |
| HERBERT GREGORY BOOKER, | ) | Honorable |
| | ) | James M. Obbish, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court.
Presiding Justice Lavin and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1     *Held*:   Summary dismissal of defendant's postconviction petition is affirmed where the petition and attachments made conclusory allegations rather than facts.

¶ 2     Gregory Booker appeals from the summary dismissal of his petition under the Post-Conviction Hearing Act. He contends that his petition stated an arguable claim of ineffective assistance of trial counsel based on counsel's failure to have a brother of his impeach the testimony of the victim and another critical witness at trial. We affirm because Booker's petition fails to state

an arguable claim of ineffective assistance for not investigating or calling the brother as a witness. Nor can the brother corroborate Booker's alibi.

¶ 3                     Factual Background

¶ 4     Booker was charged with multiple counts of aggravated criminal sexual assault and criminal sexual assault, all allegedly committed against K.M. on March 9, 2013. At a 2017 bench trial, Booker was convicted of aggravated criminal sexual assault and criminal sexual assault and sentenced to consecutive prison terms of nine years and four years, respectively. We affirmed on direct appeal. *People v. Booker*, 2020 IL App (1st) 172696-U (unpublished order under Supreme Court Rule 23).

¶ 5     We recount the relevant evidence and details from Booker's trial as set forth by this court on direct appeal.

¶ 6     Forensic evidence showed that Booker had sex with K.M. on March 9, 2013. Booker's DNA matched semen from swabs to her vaginal and anal areas.

¶ 7     K.M. testified that, in 2013, she would occasionally visit her girlfriend Kristina at the home of Kristina's aunt. At the time, both K.M. and Kristina were minors. Kristina's aunt shared the house with Booker and Mario Booker, who lived in basement bedrooms. On the night of March 8, 2013, K.M. was in the basement socializing, drinking, and smoking marijuana with Kristina and others, but not Booker. At some point, K.M. felt "tipsy" and slept in Mario's bedroom, as she had on prior overnight visits.

¶ 8     K.M. awoke to find Booker inside her underwear with his mouth on her vagina. She kicked and pushed him, but he overpowered her, held her down by her upper arms, and "stuck his penis inside" her vagina. After Booker left, K.M.'s vagina and arms hurt. Out of fear, K.M. stayed in the room until Kristina came in about a half-hour later. K.M. told her what Booker had done. Kristina

confronted Booker in his bedroom, and Mario came in and suggested leaving the matter until the morning. K.M. did not leave that night because she had nowhere to go, and Kristina stayed with her in Mario's bedroom. In the morning, Booker's daughter attacked K.M., dragging her from bed and trying to hit her. K.M. and Kristina went to the home of Kristina's grandmother, who urged her to contact the police. K.M. spoke with police and underwent a sexual assault examination at a hospital.

¶ 9    Kristina, Booker's cousin, testified that she and others, including Mario, left the home to buy food after K.M. passed out on Mario's bed. When they left, Booker was awake in his bedroom while Booker's brother and his cousin, Jermeisha Booker, were also in the basement. When Kristina, Mario, and the others returned after about 45 minutes, K.M. seemed scared, shaky, and disheveled. Kristina asked K.M. what was wrong; K.M. said that Booker "tried to have sex with her." Kristina went to Booker's bedroom to confront him.

¶ 10    Mario came in and told everyone to calm down. He suggested they discuss the matter in the morning. Noting that they were all intoxicated, Mario suggested that it would not "look right" to call the police at that point. Kristina returned to Mario's room, and she and K.M. went to sleep. In the morning, Booker's daughter tried to drag K.M. from Mario's bedroom and fought with Kristina.

¶ 11    Nurse Kindra Nelson testified to examining K.M. Nelson found bruises on K.M.'s thigh and upper arms, a hand abrasion, and redness, tenderness, and lacerations on her vagina. Nelson swabbed K.M., including her vaginal and anal areas. As Nelson recounted from her notes, K.M. said, "I woke up with him on top of me. He was rubbing me and stuff then he pulled my panties off one leg. I was pushing him off *** but he took control over me." K.M. also told Nelson that her hand abrasion may have resulted from an altercation with Booker's daughter that morning.

¶ 12    Detective Dwayne Davis testified to multiple interviews with Booker. In March 2013, Booker denied sexual contact with K.M., claiming he was in his bedroom most of the night and did not see anybody in Mario's bedroom when he went looking for a lighter. Brooker acknowledged that Kristina accused him of "touching" K.M. After receiving the forensic testing results in May 2015, Detective Davis again interviewed Booker and confronted him with the forensic evidence. Brooker professed no recollection of sexual contact with K.M. and claimed to have been "out of his mind" from marijuana when he went to Mario's bedroom to get a lighter. When an assistant state's attorney interviewed Booker, he claimed K.M. asked him to have sex after he entered Mario's bedroom.

¶ 13    Booker testified that he smoked marijuana with K.M. and Kristina on the afternoon of March 8 before going to his bedroom. Later, he went to the basement bathroom, and found K.M. and Kristina talking with the lights off. They asked if they could perform oral sex on him, but he declined and returned to his bedroom after using the bathroom. Brooker drifted in and out of sleep for several hours while others came to the home to drink and socialize. At some point, he went to Mario's room searching for a lighter, and noticed K.M. in bed. There was no lighter in Mario's room, so he went to find one. After smoking, he returned to Mario's room, and asked K.M. if she would perform oral sex on him. She refused but then agreed for him to perform oral sex on her. She removed her underwear and let him perform oral sex. Brooker then "start[ed] having sex with her" before realizing he was not wearing a condom. He left to find a condom but after being unable to locate one, did not return to Mario's room.

¶ 14    On cross-examination, Booker testified that he removed K.M.'s underwear.

¶ 15    Jermeisha, Booker's niece, testified that she stayed behind when a group went out for food. She sat on the couch in the basement with Booker's brother, Donnie, while K.M. was in Mario's

room, and Booker was awake in his own bedroom. While lying on the couch, she did not see anyone enter Mario's room, hear anything unusual, or see Booker during the about 15 minutes the group was gone. After the group returned, "Kristina and Mario were in the room. And Kristina came back out and tapped me and said that your uncle raped my girlfriend."

¶ 16 Ashley Booker, Booker's daughter, testified that she was in the basement back room in the Booker home. "[E]veryone" including herself, Jermeisha, Mario, Kristina, and K.M., were smoking marijuana and drinking. Ashley left the house around midnight. When she returned in the morning, she learned of K.M.'s accusation. She found K.M. in Mario's bedroom and asked why she was still there. K.M. kicked Ashley, who then dragged K.M. from the bed by the ankles. Ashley, K.M., and Kristina fought, with Ashley grabbing K.M.'s wrists and shoving her.

¶ 17 In finding Booker guilty, the trial court found K.M. credible and found Booker and Jermeisha not credible. The court also relied on Detective Davis's testimony that Booker initially denied having sexual contact with K.M.

¶ 18 On direct appeal, Booker contended error in allowing Nelson to quote K.M. from her notes, to which counsel objected at trial but not in the posttrial motion. *Booker*, 2020 IL App (1st) 172696-U, ¶ 2. We found error in allowing some of Nelson's testimony to K.M.'s statements, and we have related here only those portions we found admissible. *Id.* ¶¶ 21-23. But, we found no plain error because the trial evidence was not closely balanced. *Id.* ¶ 24. Specifically, we found that there was not a credibility contest between two equally plausible versions of events. *Id.* ¶¶ 24-27. Booker's accounts "shifted dramatically over time," and a "stark difference exists between no sex, forgotten sex, and consensual sex." *Id.* ¶ 26. Moreover, defense witnesses contradicted Booker. *Id.* ¶ 27. Jermeisha testified that nobody entered Mario's bedroom, but Booker was consistent across his otherwise conflicting accounts that he entered Mario's bedroom that night. *Id.* Ashley was

absent during the incident "and so could corroborate neither account." *Id.* Thus, K.M. and Booker's versions were not equally plausible and uncontradicted. *Id.*

¶ 19 In October 2020, Booker filed his *pro se* postconviction petition. 725 ILCS 5/122-1 *et seq.* (West 2020). He claimed that ineffective assistance of trial counsel for not investigating or calling as witnesses Mario and Donnie, who could have "corroborated [Booker's] alibi" and testified K.M. and Kristina "gave false trial testimony." He claimed to have given trial counsel their contact information and argued that counsel's explanation that he could not contact them was unbelievable because counsel subpoenaed Jermeisha, who lived at the same address as Donnie.

¶ 20 Booker's petition attached an affidavit attesting to the truth of the allegations. He also attached Mario's affidavit, which states that trial counsel neither interviewed, subpoenaed, or called him as a witness, despite attending Booker's trial and telling counsel he wanted to testify that K.M. and Kristina "falsely testified." Another attached affidavit, this one from Donni, stated trial counsel neither interviewed nor called him as a trial witness without indicating what his testimony would be.

¶ 21 The trial court summarily dismissed Booker's petition, finding the affidavits "clearly deficient because they do not state the witnesses' potential testimony." Only Mario's affidavit gave a sense of his potential testimony: K.M. and Kristina lied at trial. Nevertheless, Booker did "not state what they allegedly lied about, or what Mario's testimony would be in relation to that topic." And Booker failed to explain why he could not provide sufficient affidavits.

¶ 22 Analysis

¶ 23 Booker contends that he made an arguable claim of ineffective assistance of trial counsel for not calling Mario as a trial witness to impeach the testimony of K.M. and Kristina "in a case that boiled down to a credibility determination."

¶ 24    The Act provides a three-stage process for postconviction petitions. *People v. House*, 2021 IL 125124, ¶ 16. The trial court summarily dismissed Booker's petition at the first stage. We review the summary dismissal of a postconviction petition at the first stage *de novo*. *People v. Knapp*, 2020 IL 124992, ¶ 39.

¶ 25    A petition may be summarily dismissed as frivolous or patently without merit only if it has no arguable basis in law or fact, or relies on an indisputably meritless legal theory or a fanciful factual allegation. *Id.* ¶ 45. Though the court generally accepts a petition's allegations as true and construes them liberally, dismissal is appropriate when the record positively rebuts the allegations. *Id.* ¶¶ 50, 54. While we do not expect a *pro se* petition to set forth a complete and detailed factual recital at the first stage, we need not accept broad nonspecific or conclusory allegations. *People v. Delton*, 227 Ill. 2d 247, 254-55, 258 (2008). Furthermore, an affidavit or statement attached to a petition must at all stages show "the petition's allegations are capable of corroboration and identify[] the sources, character, and availability of evidence alleged to support the petition's allegations." *Id.* 725 ILCS 5/122-2 (West 2020).

¶ 26    Here, the issue involves whether Booker's petition stated an arguable claim of ineffective assistance of trial counsel for not investigating or calling Mario as a witness. A postconviction petition alleging ineffective assistance may not be summarily dismissed when a defendant shows (i) it is arguable that counsel's performance fell below an objective standard of reasonableness; and (ii) it is arguable that the petitioner was prejudiced, that is, but for counsel's deficient performance, the outcome of the proceeding would have been different. *Knapp*, 2020 IL 124992, ¶ 46; *People v. Cathey*, 2012 IL 111746, ¶ 23. Both prongs must be satisfied.

¶ 27    We find the summary dismissal proper.

¶ 28    Regarding Mario's affidavit, it asserts trial counsel did not interview or call him as a witness despite his telling counsel he wanted to testify that K.M. and Kristina "falsely testified." Yet, the affidavit states nothing in support of Booker's allegation that Mario would have "corroborated [his] alibi" or identifies any facts indicating K.M. and Kristina "gave false trial testimony."

¶ 29    Indeed, Mario cannot corroborate Booker's alibi. First, Booker asserted consent rather than alibi at trial, testifying to sexual contact with K.M. in Mario's bedroom, albeit under different circumstances than K.M. described. Second, the forensic evidence belies the alibi. Finally, Kristina's testimony for the State and Jermeisha's testimony for the defense established that Mario was not present at the time of the incident.

¶ 30    Thus, to have an effect, Mario would have to testify about what K.M. and Kristina said or did after the incident. But, beyond the nonspecific and conclusory assertion that K.M. and Kristina lied, the affidavit contains nothing in terms of the nature or content of that evidence. Absent some specificity about K.M.'s and Kristina's alleged lies, we cannot determine whether, had counsel presented Mario as a witness, his testimony arguably would change the outcome. "[T]he affidavits and exhibits which accompany a petition must identify with reasonable certainty the sources, character, and availability of the alleged evidence supporting the petition's allegations." *People v. Delton*, 227 Ill. 2d 247, 254 (2008). Booker's and Mario's affidavit fails to do so.

¶ 31    Further, Booker failed to explain why he or Mario could not have provided more than a terse and conclusory characterization of Mario's potential testimony. In sum, the petition lacks an arguable claim that counsel's allegedly deficient performance prejudiced Booker.

¶ 32    In addition, Booker contends Mario's testimony would at least arguably affect the outcome since credibility was at issue. Brooker ignores, however, that on direct appeal, we held his trial

was not a credibility contest between two plausible versions because Booker's and his witnesses' accounts contradicted each other. Booker had claimed (i) he never had sexual contact with K.M. but later asserted she consented, and (ii) he had sexual contact with K.M. in Mario's bedroom, but Jermeisha testified Booker never entered Mario's bedroom and Ashley was not present during the incident.

¶ 33 Moreover, false testimony does not *per se* render a witness incredible but is weighed against the entirety of their testimony and the evidence. See *People v. Cunningham*, 212 Ill. 2d 274, 283 (2004); *People v. Wilkinson*, 2018 IL App (3d) 160173, ¶ 40. None of the affidavits suggest that K.M. and Kristina's lies were substantial or material, much less that Mario's testimony would arguably change the outcome.

¶ 34 Affirmed.