# Illinois Official Reports

## Appellate Court

---

### *People v. Wilkinson*, 2018 IL App (3d) 160173

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL L. WILKINSON, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-16-0173 |
| Filed | June 5, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Whiteside County, No. 15-CF-164; the Hon. Walter D. Braud, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Peter A. Carusona, and Steven Varel, of State Appellate Defender's Office, of Ottawa, for appellant.<br><br>Terry A. Costello, State's Attorney, of Morrison (Patrick Delfino, David J. Robinson, and Justin A. Nicolosi, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | PRESIDING JUSTICE CARTER delivered the judgment of the court, with opinion.<br>Justice Lytton concurred in the judgment and opinion.<br>Justice McDade dissented, with opinion. |

**OPINION**

¶ 1 Defendant, Michael L. Wilkinson, appeals following his conviction for aggravated battery. He argues that the State presented insufficient evidence to prove beyond a reasonable doubt that his use of force in defending himself was not reasonable. We affirm.

¶ 2 FACTS

¶ 3 The State charged defendant with aggravated battery (720 ILCS 5/12-3.05(a)(1) (West 2014)), stemming from events occurring on May 23, 2015. The charging instrument alleged that defendant knowingly caused great bodily harm to Kevin Cook in that he struck Cook in the head and face with a hammer. Defendant disclosed to the prosecution before trial that he would be claiming self-defense.

¶ 4 Defendant's trial commenced on October 20, 2015. The evidence at trial showed that Cook lived at 607 Dixon Avenue in Rock Falls. Defendant's fiancée, Tacura Britt, lived at 614 East Fourth Street in Rock Falls. The backyards of those two residences were separated by two other yards and a fence. Defendant did not live with Britt, but was at her house frequently to watch the children or to spend the night.

¶ 5 Testimony adduced at trial showed that defendant and Cook were in their respective yards on the morning of May 23, 2015. Defendant, in an attempt to have Britt's children come into the house, yelled profanities at them. Cook testified that he called defendant over to the fence between the yards and told him "we don't do this in the neighborhood" because they did not want the children to hear such language. Cook testified that he asked defendant to "take it in the house." Cook's wife, Sherry, recalled that Cook "screamed 'hey' " at defendant, then told him "this is a good neighborhood" and that people did not want to hear defendant using bad language. Defendant heard Cook yell "hey," but he assumed Cook was not speaking to him. Later, Cook told defendant that "this is a good neighborhood, we [are] good parents." Defendant walked away.

¶ 6 Later that day, Cook heard defendant yelling to Britt: "[T]his white mother f*** back here is telling me how to talk to my kids ***." Cook again chastised defendant for his use of profanities. Cook testified that defendant threatened to kill him. Sherry testified that defendant yelled "I'll beat you down, white boy." At defendant's invitation, Cook jumped over the fence separating the yards, but did not approach defendant.

¶ 7 Defendant testified that the confrontation was mutual, with each man threatening to "whoop each other's a***." Once Cook had come over the fence, defendant and Cook continued yelling and using profanities until Britt coaxed defendant into her car. Britt testified that Cook yelled to defendant: "[W]e'll finish this when the kids aren't around." She saw Cook jump over the fence and threaten to "F [defendant] up." Cook referred to defendant as "a boy."

¶ 8 Cook testified that he saw someone return to Britt's house later that evening. He believed it was just Britt and the children. Feeling bad about the altercation, Cook and his friend, Mark Moore, approached Britt's door with the intent of apologizing and thanking her for calming defendant down. They knocked on the side door to Britt's house. Cook testified that when Britt opened the door, defendant was standing behind her. Cook was surprised to see him. Cook began to apologize when defendant struck him in the face with a hammer. Cook described the impact as a white flash. He agreed that the hammer strike caught him in the eyebrow area. He

fell down. Cook testified: "I kept getting hit, kept seeing them white flashes." While this was happening, Cook was "[t]rying to get up, trying to get away." He testified that "after a few more hits" he could not see anything. He denied ever striking defendant or Britt. He denied ever entering or reaching into Britt's house. Moore eventually helped Cook up and took him back to his house.

¶ 9     Cook testified that he suffered fractures to his eye socket, sinus cavity, and "nose socket" as a result of the altercation. He required 12 staples and a number of stitches. A tendon was also severed. He continued to suffer from eye spasms and headaches.

¶ 10     On cross-examination, Cook testified that he took "[t]wo hits" of marijuana that evening, before the physical altercation. He could not recall how much alcohol he drank because he was not keeping track. He denied telling a police officer that he and Moore went to Britt's house to confront defendant. He explained that he brought Moore to Britt's house because defendant was very upset and Cook "didn't want to appear that [he] was *** in the same manner." Moore also had a cell phone "in case anything happened."

¶ 11     Sherry testified that she saw Britt and three children return to the house that night, but did not see defendant. Cook told Sherry that he wanted to go to Britt's house to apologize to her. While Cook had consumed alcohol that day, Sherry did not believe him to be intoxicated.

¶ 12     Defendant testified that he and Britt returned to her house that night sometime between 8:30 and 9 p.m. Five to ten minutes later, they "heard a loud banging on the door." Defendant did not know who was at the door, but told them to go away, reasoning that it was too late at night for someone to be visiting. Defendant retrieved a hammer because he was concerned that someone was trying to break into the house. Britt opened the door and defendant saw Cook. Defendant told Cook to leave the property. According to defendant, Cook said he was the neighborhood watch and that "he's going to have us out the neighborhood within a week, because the neighbors don't want us in the neighborhood anyway." An argument ensued, with Cook wide-eyed and angry. Defendant testified that Cook did not apologize or thank Britt for anything.

¶ 13     Defendant observed Cook ball his hand into a fist. Defendant testified: "I proceeded to ask him, man, point blank, who the f*** is you to tell me how to talk to my kids and next thing you know I'm being punched in the face." Defendant was standing inside the house when Cook punched him. The punch landed "[r]ight between the eyes." Defendant testified that after he was punched, he hit Cook with the hammer and then they both fell through the doorway and onto the porch. Defendant believed it was necessary to swing the hammer to protect himself.

¶ 14     Once they had fallen onto the porch, Cook had a hold on defendant's arms, and defendant repeatedly asked him to let go. He estimated that he told Cook at least five times to let him go. Defendant could not recall whether Cook initially grabbed his arms inside the house or after they had fallen outside. Defendant was trying to get away and "struck him again with the hammer." Moore took the hammer out of defendant's hand and threw it in the yard.

¶ 15     On cross-examination, defendant admitted he could not recall exactly how many times he hit Cook with the hammer inside the house, testifying that he "just started swinging." He testified that there was no blood in the house because after he struck defendant with the hammer they were "instantly *** outside on the ground fighting, tussling and stuff." Defendant did not see Moore until he and Cook were outside. He did not know if the first hammer strike caused the gash over Cook's eye. Defendant recalled hitting some garbage cans as he fell onto the porch; he did not know if Cook hit the cans as well.

¶ 16        Britt testified that she and defendant returned to the house around 8 p.m. The children were at a babysitter's house. Around 8:15 p.m., Britt "heard a big bang on the door." She peered through a window and saw Cook and another man at her door. She opened the door; Cook was standing on the grass adjacent to the concrete, with Moore behind him. Cook told Britt to tell defendant not to use profanities outside while yelling at the children. Britt asked Cook why he cared what defendant did. According to Britt, Cook responded: "[T]his is a good neighborhood and we're good parents." Britt described Cook as mad, with wide eyes and spit flying from his mouth as he spoke. Britt repeatedly told Cook to leave.

¶ 17        Britt yelled for defendant because she was scared. Defendant came to the door, standing behind Britt. Britt testified: "[A]s soon as he seen [defendant], [Cook] instantly went into a rage. *** [H]e was *** screaming even louder, screaming, just screaming. He was like, well, come out here, I'll give you a butt whoopin', *** I'll show you what a redneck country boy can do, come outside." Defendant and Cook yelled at each other. Britt continued to tell Cook to leave. According to Britt, Cook yelled: "I'm neighborhood watch. If you guys don't get out of here in a week, I'll have you out of here." Britt noted that Cook did not apologize.

¶ 18        Britt continued to stand between the two men because she did not want the situation to escalate. She could smell an odor of alcohol so strong it made her "sick to [her] stomach." Britt testified that Cook eventually punched defendant. Cook's fist grazed Britt's face before hitting defendant. Cook then stepped into the house and grabbed defendant's left arm. Britt testified that defendant reached for a hammer, which was sitting on the adjacent countertop. Defendant struck Cook in the head twice with the hammer, and they fell outside through the doorway. Cook was still holding onto defendant. Defendant landed on top of Cook; Moore was still standing in the grass next to the concrete. Britt testified that defendant and Cook "were wrestling around outside on the cement." Defendant was continuously yelling at Cook to let go of him. Britt recalled that Moore took the hammer out of defendant's hand. Britt called 911.

¶ 19        John Wolfe testified that he lived across the street from Britt. He was on the front steps of his house on the night of May 23, 2015, when he heard yelling from "[s]ome big, white guy" in Britt's side yard. Wolfe saw the man standing on a cement porch, yelling at someone inside the house. A second man was standing behind him. Wolfe explained what happened next:

> "[H]e yelled for a few minutes, asked the neighbor to come outside and said he was going to kick his a*** and then the next thing I know I seen him step through the door, *** looked like he was swinging a punch, big right hook coming up over top and the next thing I know he come back out the door on his back with a thin guy on top of him and the neighbor lady yelled that she was calling 9-1-1, the fight broke up and then a few minutes later the police showed up."

Wolfe had never spoken to any of the individuals involved before and did not know their names.[1]

¶ 20        Officer Scott Allspaugh of the Rock Falls Police Department testified that he was dispatched to Britt's residence at approximately 8:45 p.m., after Britt had called 911. Allspaugh and Officer Ryan McKanna met with defendant and Britt. Allspaugh met "[v]ery briefly" with defendant and did not recall noticing any injuries to him at that time. However, Allspaugh indicated in his report that defendant "appeared to have been battered." Defendant

---

[1]Wolfe's characterizations of Cook and defendant as "big" and "thin," respectively, are supported by the photographs of each man on the record.

was largely uncooperative with the officers, often yelling and not answering the officers' questions. Defendant told Allspaugh that he had been in a fight, and Britt told them that the "heavy-set *** white male" who was involved had left.

¶ 21    The officers proceeded to the backyard of 607 Dixon Avenue, where they encountered Cook. Allspaugh called for an ambulance after observing "several severe wounds to [Cook's] head." Specifically, Allspaugh noted the worst damage was to Cook's left eye. He also observed several large lacerations on the back and top of his head. Allspaugh could smell the odor of alcohol on Cook's breath and believed him to be heavily intoxicated. Allspaugh testified that some of the indicators of intoxication could also have been the result of head trauma. Allspaugh estimated that Cook was on the back deck of his own home, approximately 300 feet away from the scene of the altercation when they found him.

¶ 22    Allspaugh recovered a hammer from Britt's yard. The hammer appeared to have dried blood on it. Allspaugh also took photographs showing Cook's head and facial wounds, which were introduced into evidence. The pictures show a large gash over Cook's left eye, where the eye socket meets the nose. They also show scrape-like wounds on the rear portion of the top of his head. The photographs show dried blood throughout the left side of his face and head. Pictures from days after the incident show a severely blackened left eye, with minor swelling to Cook's right eye. They also show a smaller cut with some bruising on Cook's left temple and a sutured wound on the back of his head. Photographs of the hammer show what is apparently dried blood on the head, claw, and upper handle of the hammer.

¶ 23    Police officers did not take photographs of defendant. However, in the aftermath of the altercation, Britt noticed that defendant had scrapes on his hands and left knee. His arm had handprints and fingernail marks. His nose was swollen and he had a knot on his head. Britt took photographs of those injuries, and those photographs were introduced at trial. They show defendant with a swollen nose, welt-like marks on his right arm, redness and a small wound on his left arm, and scrapes on his elbow, knee, and knuckles. Britt and defendant went to the hospital later that night.

¶ 24    On cross-examination, Allspaugh testified that he briefly spoke to Britt at the scene of the altercation. Britt told Allspaugh that Cook had come to her house and demanded to speak with defendant. Defendant was standing behind Britt when she answered the door, and Cook punched defendant. Britt also told Allspaugh that Moore later joined into the altercation. Allspaugh also spoke with Moore that night. Moore told Allspaugh that he had been able to pry the hammer away from defendant and threw it in the yard. Allspaugh agreed that Cook and Moore went to Britt's house "to confront [defendant]."

¶ 25    Officer Mark Davis of the Rock Falls Police Department spoke with defendant and Britt after Cook was taken away by ambulance. Britt and defendant told Davis that Cook had "banged on the door," then reached over Britt to punch defendant in the face. Davis did not see any injuries to defendant. Davis described the area in which the altercation took place as a small sidewalk in front of the side door of Britt's house.

¶ 26    James Moffitt testified that he was the paramedic who responded to Cook's address. Because of the blood, Moffitt could not tell precisely how many wounds Cook had to his head, but Moffitt knew there was more than one. He testified that most of the bleeding was from the large wound above Cook's left eye. Moffitt speculated that the swelling and bruising around Cook's left eye could be from the strike that caused the large wound. Moffitt noted that Cook had multiple other lacerations on the back and top of his head. Moffitt later learned that Cook

had been diagnosed with a sinus fracture. He testified that Cook's multiple injuries were consistent with being struck by a hammer.

¶ 27 The court asked Moffitt if all of the blood shown in the photographs was from the one, large wound. Moffitt replied that most of it was. The court asked Moffitt if the other lacerations were from a hammer or a fall. Moffitt responded: "I would say a combination. If there was a struggle going on, you know, if he was blocking the blows, it could have definitely just brushed him and not had a direct hit." Moffitt added that the other wounds "absolutely" came from a hammer blow. Moffitt knew that the wound by Cook's eye required staples, but did not know if the same was true of the other wounds.

¶ 28 Karrie Leigh testified that she worked as a physician's assistant in an emergency room. She was working on May 28, 2015, when defendant came to the emergency room complaining of headaches and dizziness. He had been in the emergency room five days earlier following an altercation. Leigh reviewed the notes from defendant's emergency room treatment. They indicated that he had presented that night having been punched in the face and hit in the head, complaining of pain in his face, nose, head, right hand, and back. Defendant had undergone a CAT scan and X-ray that night and had been prescribed pain medication.

¶ 29 Following closing arguments, the court instructed the jury that, to sustain a charge of aggravated battery, the State must prove, first, that defendant knowingly caused great bodily harm to Cook and, second, "that the Defendant was not justified in using the force which he used." The court further instructed the jury that "a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself." The jury found defendant guilty.

¶ 30 Defendant subsequently filed a motion for new trial. In ruling on the motion, the court commented that "the elephant in the room" was that "this case [was] about being black." The court found it clear that Cook did not like defendant because of his race, based on Cook's comments that defendant was not welcome in the neighborhood. The court noted that defendant had been made well aware of that racial animosity before the physical altercation. The court also pointed out that Wolfe was the "one witness that is completely, his statements are beyond dispute, totally believable, not contradicted in any way." The court concluded that Cook was the aggressor. The court noted that while defendant had been initially justified in using force, the State had proven beyond a reasonable doubt that he used "excessive force in the lawful act of self-defense." The court denied defendant's motion.

¶ 31 At sentencing, the court again commented that defendant would not have been guilty if he had only struck Cook with the hammer "once or twice." The court made clear that it was sentencing defendant not for initially striking Cook with the hammer, but "for not stopping." The court also condemned the actions of the investigating officers in the case, opining:

> "[T]he police already made up their mind what the charge was before they ever spoke to you. They didn't even come and ask you what happened. They didn't come and ask your girlfriend what happened, even though she was the one that called the police. They just went directly to the victim and got his side of the story and the case was opened, and closed, and shut."

The court sentenced defendant to a term of three years' imprisonment.

ANALYSIS

¶ 33    On appeal, defendant argues that the evidence presented at trial was insufficient to prove beyond a reasonable doubt that defendant did not reasonably believe that the force he used was necessary to prevent great bodily harm. We find that a rational juror could have found defendant guilty beyond a reasonable doubt and we therefore affirm.

¶ 34    Section 7-1(a) of the Criminal Code of 2012 holds as follows:

> "A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." 720 ILCS 5/7-1(a) (West 2014).

The section further provides that a person who is an "aggressor" may not invoke self-defense. *Id.* § 7-1(b).

¶ 35    A claim that self-defense justified a use of force that was likely to cause great bodily harm contemplates six distinct elements: (1) unlawful force was threatened against a person, (2) the person threatened was not the aggressor, (3) the danger of great bodily harm was imminent, (4) the use of force was necessary, (5) the person threatened actually and subjectively believed a danger existed that required the use of the force applied, and (6) the beliefs of the person threatened were objectively reasonable. *People v. Lee*, 213 Ill. 2d 218, 225 (2004). Once a defendant raises the affirmative defense of self-defense, the burden shifts to the State to prove beyond a reasonable doubt that defendant did *not* act in self-defense. *Id.* The State satisfies this burden if it negates any of the six elements beyond a reasonable doubt. *Id.*

¶ 36    Where a defendant contends on appeal that the State failed to negate self-defense beyond a reasonable doubt, our standard of review is the same as in any other challenge to the sufficiency of the evidence: whether, after considering the evidence in the light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt that the defendant did not act in self-defense. *Id.*; see also *People v. Collins*, 106 Ill. 2d 237, 261 (1985). All reasonable inferences in favor of the prosecution will be allowed. *People v. Bush*, 214 Ill. 2d 318, 326 (2005). The reasonableness of a defendant's belief that the use of force was warranted is a factual issue often involving credibility determinations and is thus the province of the jury. *Lee*, 213 Ill. 2d at 225.

¶ 37    The parties on appeal limit their arguments to the reasonableness of defendant's belief that striking Cook with the hammer was necessary to prevent great bodily harm to himself. The State concedes "that the record in this case supports defendant's and trial court's beliefs that Cook was the initial aggressor. The testimony of John Wolfe was the strongest evidence supporting that stance." More pointedly, the State concedes that Cook punched defendant in the face. The State, however, argues that defendant used "excessive force," or "an amount of force far greater than needed to neutralize the threat posed by Cook." Put in terms of the elements of self-defense, the State contends that the evidence was sufficient to prove beyond a reasonable doubt that defendant's subjective belief that the amount of force he used was necessary to prevent great bodily harm was unreasonable.

¶ 38     After defendant initially struck Cook with the hammer while the men were in the house, defendant and Cook fell through the doorway onto Britt's patio. Defendant and Cook testified to conflicting versions of the events that followed. Defendant testified that Cook was holding onto him and would not let go. He described the engagement as "fighting" or "tussling." He estimated that he told Cook at least five times to let go of him before striking Cook once with the hammer in an effort to free himself. Cook, however, testified that after being struck initially with the hammer, he was simply trying to stand up and flee the situation. He testified that once he was on the ground, he "kept getting hit" and was hit in the head at least "a few" times until he could no longer see.

¶ 39     The jury was thus presented with two scenarios: one in which Cook's aggression continued and defendant used the hammer to free himself and one in which Cook was struck repeatedly with the hammer while he was trying to leave. It is well settled that it is the province of the jury to assess the credibility of the witnesses and to resolve conflicts in the evidence. *People v. Washington*, 2012 IL 110283, ¶ 60. In evaluating an attack on the sufficiency of the evidence, a reviewing court does not retry the case or reweigh evidence, but instead defers to the jury on matters of witness credibility or the weight afforded to each witness's testimony. *E.g. People v. Jones*, 337 Ill. App. 3d 546, 555 (2003). Here, the jury was free to conclude that Cook's testimony on this particular point was the most credible, and thus find that defendant struck Cook repeatedly in the head with a hammer while he was on top of Cook and Cook was trying to get away. It follows that the jury could rationally conclude that any belief defendant held at that point that those hammer strikes were necessary to protect himself was unreasonable. See *Lee*, 213 Ill. 2d at 225.

¶ 40     In reaching this conclusion, we recognize that Cook's credibility was imperfect. Specifically, his testimony that he merely went to Britt's house to apologize when he was suddenly and unprovokedly attacked by defendant was so undermined by other evidence that even the State on appeal concedes that Cook was actually the initial aggressor. However, our supreme court has made clear that "even when a witness is found to have knowingly given false testimony on a material point, a fact finder may reject his entire testimony but is not bound to do so." *People v. Cunningham*, 212 Ill. 2d 274, 283 (2004); see also *Sparling v. Peabody Coal Co.*, 59 Ill. 2d 491, 498-99 (1974) (stating that even "contradictory testimony of a witness does not *per se* destroy [his credibility] ***, and it remains for the trier of fact to decide when, if at all, he testified truthfully"). In other words, Cook's untruthfulness about his initial intentions did not fatally undermine his credibility as to his later actions. Indeed, it is plausible that a hammer strike to Cook's face, leaving a large gash between his eyes, was enough to convince the initially aggressive Cook that it was time to leave.

¶ 41     In sum, testimony from the victim in this case tended to show that defendant continued to strike him with a hammer after any threat had subsided. The jury could reasonably have concluded that this testimony was credible and, in turn, that defendant did not reasonably believe those continued hammer strikes were necessary to prevent great bodily harm to himself. Accordingly, we find the State produced evidence sufficient to prove beyond a reasonable doubt that defendant was not acting in self-defense.

¶ 42                                              CONCLUSION

¶ 43         The judgment of the circuit court of Whiteside County is affirmed.

¶ 44         Affirmed.

¶ 45         JUSTICE McDADE, dissenting.

¶ 46         The majority defers to the jury's determination that certain portions of Cook's testimony were credible and affirms Wilkinson's conviction. However, our supreme court has explicitly stated that we need not blindly accept every credibility determination made by the fact finder. *People v. Wheeler*, 226 Ill. 2d 92, 115 (2007) ("The simple fact that a judge or jury accepted the veracity of certain testimony does not guarantee reasonableness."). I would find that it was unreasonable for the jury to find Cook's testimony credible, and it is therefore improper for this court to defer to such an unreasonable determination. Cook's recitation of the events was incredible. And because he provided the only testimony that could even arguably support the jury's conclusion that Wilkinson's continued belief in the need for self-defense was unreasonable, I would find the evidence insufficient and reverse Wilkinson's conviction. I therefore respectfully dissent.

¶ 47         The altercation in the present case has been broken down by the majority and the parties into two separate portions: that occurring inside Britt's house and that occurring outside. I disagree with that characterization. There is *no* evidence in the record that either Cook or Wilkinson stopped fighting and consciously decided to take a break and resume their altercation outside. This was a single, seamless event. Wilkinson testified, and his injuries confirmed, that Cook was holding him and refused to let him go as they catapulted through the door. His testimony gains weight from Cook's knowledge that he had help waiting outside. It was only after they were out of the house that Wilkinson became aware of the presence of Moore, Cook's backup. It would be totally *un*reasonable for him not to feel even more vulnerable with that knowledge. With respect to the so-called first portion, the State acknowledges "that the record in this case supports Wilkinson's and trial court's beliefs that Cook was the initial aggressor. The testimony of John Wolfe was the strongest evidence supporting that stance." The State expressly concedes that Cook punched Wilkinson in the face. It was clever of the State to make that concession because the majority accepts it and the State's two-fights argument and focuses its analysis on the portion of the altercation occurring outside as though it were a separate event.

¶ 48         It is worthwhile to consider precisely why the State was forced to make such a concession. Cook testified that he went to Britt's house to make amends when he was suddenly and maliciously attacked by Wilkinson. This claim was initially suspicious, as Cook also testified that he brought Moore with him and Moore brought his cell phone "in case anything happened." More importantly, that testimony was directly refuted by the neutral testimony of Wolfe, who testified that he saw and heard Cook yelling and threatening to "kick [Wilkinson's] a***," then saw him step through the doorway to punch someone. It would not be reasonable for a juror to conclude that Cook's testimony was credible. See *id.* Further, there can be no dispute on those facts that Wilkinson was acting in justified self-defense when he first struck Cook with the hammer. See, *e.g.*, *People v. Givens*, 26 Ill. 2d 371, 376 (1962) (reversing murder conviction where "evidence established that the homicide was committed

- 9 -

by defendant in his own habitation against one who unlawfully entered it and from whom defendant reasonably feared an assault").

¶ 49    As the majority describes, the jury was presented with two versions of the remainder of the altercation, after Cook and Wilkinson had fallen through the doorway to the concrete porch. Wilkinson testified that he and Cook were "fighting" or "tussling" and that he told Cook repeatedly to let him go before striking at him with the hammer to free himself. Cook testified that after falling through the doorway, he only wanted to get up and leave. He testified that Wilkinson struck him in the head with the hammer multiple times.

¶ 50    To be sure, *if* the jury accepted Cook's version of events, it could rationally have determined that Wilkinson was no longer acting in self-defense at that point. The majority's analysis essentially ends here. But our supreme court's decision in *Wheeler* urges us to press on, determining whether it would be *reasonable* for the jury to find that portion of Cook's testimony credible. *Wheeler*, 226 Ill. 2d at 115 ("[W]hile a fact finder's decision to accept testimony is entitled to deference, it is neither conclusive nor binding.").

¶ 51    In *Cunningham*, 212 Ill. 2d at 283, our supreme court considered the same issue we face here:

> "[E]ven when a witness is found to have knowingly given false testimony on a material point, a fact finder may reject his entire testimony but is not bound to do so. *Swift & Co. v. Industrial Comm'n*, 52 Ill. 2d 490, 495 (1972). See also *Sparling v. Peabody Coal Co.*, 59 Ill. 2d 491, 498-99 (1974) (stating that even 'contradictory testimony of a witness does not per se destroy [his credibility], and it remains for the trier of fact to decide when, if at all, he testified truthfully'). In other words, it is for the fact finder to judge how flaws in part of the testimony affect the credibility of the whole. Of course, for the reasons discussed above, the fact finder's judgment in that regard must be reasonable in light of the record. In some cases a reviewing court may find, after considering the whole record, that flaws in testimony made it impossible for any fact finder reasonably to accept any part of it."

Regarding the facts of the case before it, the *Cunningham* court pointed out that while certain statements made by the witness were "questionable," there was no proof that those statements were "lies or errors." *Id.* at 282-83.

¶ 52    That is not the case here. Multiple statements made by Cook in his testimony were not merely "questionable," but demonstrably and knowingly false. Juxtaposed against the testimony of the neutral neighbor, John Wolfe, and against his own contradictions, it is clear that Cook lied about thinking only Britt and the children were home, lied that he went to apologize and thank Britt, lied that he tried to apologize before he was hit, lied when he denied reaching or going into Britt's house, lied when he denied striking Wilkinson, and lied in claiming that Wilkinson was the aggressor.

¶ 53    While Cook's testimony regarding the initiation of the encounter was inarguably false, his testimony regarding the rest—that he was simply trying to leave while Wilkinson struck him at least "a few" times with the hammer—is further undermined by the photographic evidence in the case. The photographs show a large, serious gash over Cook's left eye. Cook testified that the first blow from the hammer caused this wound. There is also a minor wound to his left temple. The remainder of Cook's injuries—all still paling in comparison to the large gash—are on the back of his head or the rear portion of the top of his head. By all accounts, Cook was on his back and Wilkinson was on top of him. It is unclear how, from this position, Wilkinson

could strike Cook in the back of the head with a hammer. Moreover, if the gash over Cook's eye represents the damage caused by a hammer strike, Cook's other injuries are simply not of a comparable nature. It seems a far more reasonable interpretation of the evidence that the relatively minor wounds on the back of Cook's head were the result of his falling backwards onto the concrete porch. The testimony that Cook received "a few" blows from the hammer while he was on his back is simply not borne out by the photographs of his wounds.

¶ 54    Furthermore, the photographs of Wilkinson's injuries support *his* version of events. As described by the majority, those photographs showed a swollen nose and a knot on his head, apparently confirming the punch to his face, and "welt-like marks on his right arm, redness and a small wound on his left arm, and scrapes on his elbow, knee, and knuckles." *Supra* ¶ 23. The photographic evidence in the case, including the welts and redness on Wilkinson's arms, thus casts doubt upon Cook's testimony in two ways: (1) How did Cook have only one significant injury to his face if he was struck in the head multiple times with a hammer while Wilkinson was on top of him? and (2) How did Wilkinson acquire such a variety of injuries if Cook was merely trying to flee? Indeed, nothing in Cook's version explains Wilkinson's injuries. In affirming, the majority not only does not address these questions; it makes no reference to the photographs at all in its analysis.

¶ 55    Cook was repeatedly untruthful in his testimony regarding the beginning of his altercation with Wilkinson. Moreover, his testimony concerning the so-called second portion of the altercation was seriously undermined by the photographic evidence. Cook's testimony, the most significant basis for Wilkinson's conviction, is precisely the type of "unreasonable, improbable, or unsatisfactory" evidence that creates a reasonable doubt as to Wilkinson's guilt. *Wheeler*, 226 Ill. 2d at 115. While the jury may have found Cook credible, that determination was unreasonable, and we should not defer to it. *Id.* For that reason alone, I would find the evidence of Wilkinson's guilt insufficient and reverse his conviction outright.

¶ 56    I would, however, find the evidence insufficient in a second distinct way as well. According to Cook's testimony, the first hammer strike that he received was, in his words, "[i]n my face." When Cook indicated precisely where he had been hit, the prosecutor stated: "And now you're indicating in your eyebrow area of your left eye; is that correct?" Cook agreed. As demonstrated by the photographs, the only injury in that area of Cook's head was the large gash that has been discussed at length. Thus, Cook testified that the large gash was the first injury he received. Indeed, the majority references this sequence of events when it opines: "it is plausible that a hammer strike to Cook's face, leaving a large gash between his eyes, was enough to convince the initially aggressive Cook that it was time to leave." *Supra* ¶ 40.

¶ 57    Under the aggravated battery statute as charged, the State was obligated to prove beyond a reasonable doubt that Wilkinson caused "great bodily harm or permanent disability or disfigurement." 720 ILCS 5/12-3.05(a)(1) (West 2012). In fact, the charging instrument alleged that Wilkinson "knowingly caused great bodily harm to [Cook] in that he struck [him] in the head and face with a hammer, causing him to suffer a frontal sinus fracture."

¶ 58    While the photographs taken the night of the incident show Cook's face to be, bluntly speaking, a bloody mess, Moffit testified that most of the blood, swelling, and bruising was from the one large injury. To that point, the only additional injuries seen in photographs taken later are a small cut with some bruising on Cook's temple and some cuts and scrapes to the back of his head. None of those injuries, of course, would have caused the frontal sinus fracture.

- 11 -

¶ 59      There is no dispute in this appeal that Wilkinson was fully justified in striking Cook with the hammer after Cook had breached the house and punched Wilkinson in the face. See *supra* ¶ 48. The majority at least implies this conclusion when it proceeds immediately to what it has called the second portion of the altercation. The majority's holding is that Wilkinson was no longer acting in self-defense when, at least according to Cook, he continued to beat Cook with the hammer outside. Yet the evidence unequivocally shows that the major wound to Cook's face—the wound that clearly was the source of the frontal sinus fracture referenced in the charging instrument—was the result of the first, justified hammer strike.

¶ 60      To sustain a conviction on the theory that it was Wilkinson's continued hammer strikes that negated the reasonableness of his belief in the necessity of his actions,[2] the State would need to prove that Wilkinson caused great bodily harm *after* the point at which he was no longer reasonably defending himself. Even accepting as true Cook's later testimony that he was merely trying to get away when Wilkinson repeatedly struck him with the hammer outside, the photographs show that those alleged additional hammer strikes caused—at most—some cuts, scrapes, and slight bruising. These injuries conformed with Moffit's suggestion that the strikes may have been glancing blows. No rational juror could conclude that injuries of that nature rise to the level of great bodily harm. See *In re J.A.*, 336 Ill. App. 3d 814, 817 (2003) ("We have repeatedly articulated the proposition that 'great bodily harm' is more serious or grave than lacerations, bruises, or abrasions that characterize 'bodily harm.' ").

¶ 61      Accordingly, even if this court defers to a finding that Cook's testimony was credible, that very testimony and the photographs rebut the conclusion that Cook suffered great bodily harm after he fell outside the house. On the facts of this case, I would reverse Wilkinson's conviction outright because Cook's testimony cannot reasonably be considered credible (see *supra* ¶ 55). However, even if I were to find Cook's testimony credible, I would reduce Wilkinson's conviction to simple battery because the State failed to prove he caused great bodily harm after it claims he was no longer reasonably defending himself.

¶ 62      Finally, I feel compelled to comment, as did the trial court, on the one-sided nature of the police investigation of this incident. The officers evidenced little or no interest in Wilkinson's version of the events or in his physical condition. His visible injuries were evidence of what had occurred as much as Cook's were, yet they took no photographs of him. Fortunately, Britt had the foresight to take pictures and the concern to take him to the hospital for assessment and treatment of his injuries. Without her, that evidence would not have been preserved. And, without that evidence, the very troubling equivocal nature of the State's case could have been even more damaging to Wilkinson than it was.

¶ 63      Officer Allspaugh testified that he met "very briefly" with Wilkinson and did not recall noticing any injuries to him at that time. His faulty recollection was, however, impeached by his written report of the incident stating that Wilkinson "appeared to have been battered"—not just struck or bruised or scraped, but "battered." Similarly, Officer Davis testified that he did not see any injuries to Wilkinson, raising an implicit inference that there had been none. Fortunately, the photographs taken by Britt and the finding from Wilkinson's visit to the emergency room that night and a subsequent visit a few days later were available to offset the State's attempt to convey the impression to the jury that Wilkinson had inflicted significant

---

[2]This is, in fact, what the State argues on appeal, writing: "Wilkinson brought a hammer to a fist fight and continued to use the hammer long after the threat of Cook's fists had ceased."

injury on Cook and had emerged from the altercation unscathed. It does not appear to me that the State was engaged in creating and presenting a fair and objective record to facilitate the jury's search for truth.

¶ 64        For all of these reasons, I would reverse the conviction of Michael Wilkinson outright.