**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (3d) 230569-U

Order filed January 30, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-23-0569 Circuit No. 21-CF-1035 |
| NEVES C. DAVIS, | ) ) ) | Honorable Kenneth L. Zelazo, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE ANDERSON delivered the judgment of the court.
Justices Peterson and Bertani concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*: (1) The evidence was insufficient to disprove defendant's self-defense claim. (2) Separate convictions for aggravated unlawful use of a weapon and unlawful possession of firearm ammunition without a Firearm Owners Identification card did not violate the one-act, one-crime rule. (3) Counsel was ineffective for failing to file an assessment waiver.

¶ 2    Defendant, Neves C. Davis, appeals his convictions, arguing: (1) the State failed to disprove his affirmative defense of self-defense, (2) the Will County circuit court erred in refusing to tender to the defense prior domestic battery adjudications demonstrating the alleged victim was

a violent individual, (3) his convictions violate the one-act, one-crime rule, (4) the court considered improper aggravating factors at sentencing, and (5) counsel provided ineffective assistance by failing to file an assessment waiver. We affirm in part, reverse in part, and remand for further proceedings.

## I. BACKGROUND

¶ 3 Following a joint bench trial, defendant, along with his brother and codefendant, Tomas Williams, were found guilty of aggravated battery (720 ILCS 5/12-3.05(e)(1) (West 2020)), two counts of aggravated discharge of a firearm (*id.* § 24-1.2(a)(2)), aggravated unlawful use of a weapon (AUUW) (*id.* § 24-1.6(a)(1), (3)(A-5), (3)(C)), and unlawful possession of firearm ammunition without a Firearm Owners Identification (FOID) card (430 ILCS 65/2(a)(2) (West 2020)).[1] The aggravated battery charge alleged defendant knowingly discharged a firearm without legal justification causing injury to Alex Montgomery. The two counts of aggravated discharge of a firearm alleged defendant knowingly discharged a firearm in the direction of Montgomery and Logan Opiola. The AUUW charge alleged defendant knowingly carried an uncased, loaded, and immediately accessible firearm in public without a valid license under the Firearm Concealed Carry Act (430 ILCS 66/1 *et seq.* (West 2020)) or a valid FOID card.

¶ 4 Initially, the court determined that the cases against both defendants were consolidated because they were brought together before a grand jury. The State later filed a motion to sever the prosecutions. In ruling on the State's motion, the court determined that the motion would be granted, and the proceedings would be severed if defendants elected to have a jury trial. Conversely, the court stated that it would deny the motion if defendants decided to proceed to a

[1]Defendant was acquitted on a third count of aggravated discharge of a firearm. At sentencing, defendant's additional convictions for reckless discharge of a firearm and a second count of AUUW were vacated pursuant to the one-act, one-crime rule.

bench trial. The court did not revisit the ruling, and defendants opted for a bench trial. When the trial commenced, the State confirmed that it would be proceeding on the matter as one consolidated case. After further discussion with the parties, the court concluded that defendants were being tried separately but through simultaneous proceedings and emphasized it would "consider only appropriate evidence for an appropriate defendant."

¶ 5     Prior to trial, defendant filed a motion to appoint a DNA expert to monitor firearm testing conducted by the State. The motion argued that defendant lacked the funds to hire an expert because he was indigent and included a supporting affidavit of assets and liabilities showing that he had no income or assets. The motion was granted, and the county was ordered to pay for the expert.

¶ 6     At trial, the evidence tended to show that on the afternoon of July 19, 2021, defendant was walking home with Williams. On the way, someone yelled at them from the rear window of a passing vehicle travelling in the same direction. The vehicle briefly stopped after passing defendant and Williams, then turned around and parked against a curb. The occupants then exited the vehicle wearing ski masks and advanced toward defendant and Williams. As the masked individuals approached, both Williams and defendant discharged firearms at them before fleeing. One individual, Montgomery, sustained a gunshot wound to the chest.

¶ 7     First responders testified that Montgomery, identified as a white male with dreadlocks wearing a red beanie cap, was uncooperative and refused to provide information about what happened. Montgomery was transported to a hospital for treatment and released the same day. Montgomery did not testify as a witness during the trial.

¶ 8     Eight shell casings were discovered at the scene in addition to a partially loaded firearm magazine. Montgomery's vehicle was found parked "perfectly" alongside the curb with all the

3

doors closed and the rear passenger window rolled completely down. A search of the vehicle yielded nothing of evidentiary value.

¶ 9        The driver of the vehicle, Opiola, was granted immunity from prosecution by the State and compelled to testify after asserting his fifth amendment right against self-incrimination. According to his testimony, Opiola was driving Montgomery's vehicle when he realized he had forgotten something and needed to return home. While making a U-turn, Opiola heard gunshots and parked the vehicle. Opiola explained that he and Montgomery exited the vehicle and ran away on foot from the gunfire believing it would have been worse to stay in the vehicle and drive toward it. Montgomery was shot as they were running. Opiola stated that the shooters were approximately two houses away, but he did not see them. He testified that there were no guns or other occupants in the vehicle at the time and no one yelled from the vehicle at anyone.

¶ 10       Officers apprehended defendant at his home shortly after the incident. While detained in a squad car, defendant stated he was walking home alone when someone wearing a mask yelled at him from the window of a passing vehicle. The vehicle stopped and multiple occupants exited and began approaching defendant. As they approached, defendant discharged his firearm. When an officer indicated that defendant probably thought the occupants had a gun and he was just protecting himself, defendant replied that was exactly what happened. Defendant told the police that he disposed of the gun in a trash can. Police recovered the firearms defendant and Williams discharged in a backpack located inside the bedroom closet of defendant's home.

¶ 11       During a later interview at the police station, defendant indicated Williams was present during the incident and stated that there were three or four individuals that exited the vehicle. In response to being asked if he saw any weapons, defendant stated, "I didn't know what I saw, I just saw people approaching me with ski masks."

¶ 12    Williams told the police that he was walking with defendant when someone yelled at them from the rear window of a passing vehicle. The vehicle turned around and the occupants jumped out. As the individuals "swarmed" around Williams and defendant it appeared that one individual was reaching into his pants in a manner consistent with retrieving a weapon. Williams admitted to discharging his firearm at the individuals as they approached from 25 to 30 feet away before fleeing, believing that he could have been shot and killed if he had not run away. After Williams's statements were introduced as evidence, defense counsel indicated to the court that it would adopt the cross-examination conducted by Williams's counsel as it related to the entire case, but not as it related to any statements made by Williams. The court then asked: "So it's clear then, at this point, [defense counsel], you are accepting the Court's ability to discern which statements you are referring to as admissible against [defendant] and inadmissible as to [defendant], is that correct?" Defense counsel agreed.

¶ 13    Hannah Stigter testified that her vehicle was struck by gunfire during the incident. Stigter recalled seeing two males appearing to shoot at each other while slowly running down the sidewalk. Stigter noted that one man was holding something that looked like a gun. Stigter also stated that one man was wearing a grey shirt and the other was wearing a white or black shirt. Stigter sped away from the scene when she realized her vehicle had been struck.

¶ 14    Diane Wuestenfeld testified that a bullet struck her house. She observed three males running through her backyard after the shooting. One man appeared to have an abdominal wound. Jeffrey Bishop testified that his son's car was struck by gunfire while parked in front of Bishop's home. Bishop stated that just prior to hearing what he thought were fireworks, he saw two men walking by his house. After he heard the gunshots, Bishop briefly chased three individuals he saw running through his yard because he believed they had stolen items from his garage.

¶ 15        James Gutierrez testified that two men walked in front of his vehicle at an intersection and then turned around and began moving back in the same direction they had just walked. One man pulled a gun from his waistband after Gutierrez witnessed two individuals down the street yelling loudly and antagonistically.

¶ 16        Michael Smolik testified that he saw two individuals walk past his house. Both individuals were putting something in their pants, one had a gun and the other had what Smolik believed to be a package. A police officer that interviewed Smolik testified that Smolik never indicated that he saw any individuals with a gun or that he saw anyone put a gun in their pants. Smolik acknowledged during his cross-examination that he may not have told the officer he saw someone with a firearm.

¶ 17        Three doorbell camera videos from homes in the area were admitted into evidence. Two videos, taken from different angles, showed Williams as he jogged along the sidewalk carrying an object in his right hand. In the videos, Williams wore a white shirt, black pants, and red shoes. Shortly after Williams passed the cameras, defendant followed and appeared to be carrying an object. Defendant was wearing a black track suit with white stripes over a white shirt. Another doorbell video from a different house captured Opiola ringing the doorbell and standing with Montgomery on the porch. Opiola was wearing a grey sweatshirt and a black cross-body bag. Montgomery was wearing a white shirt with a large bloodstain on one side and a red beanie cap.

¶ 18        Audio recordings from multiple 911 calls were introduced as evidence. Frank Castenda reported that he heard gunshots, but indicated he did not see anyone with a gun. Castenda stated he saw two males and that was one was wearing an orange mask that covered his face. Castenda described the mask as the kind that would be worn during the winter. The parties stipulated that

6

Castenda would testify that he observed two men exiting a vehicle. One man was wearing a neon orange mask and had an automatic handgun in his hand.

¶ 19    During closing arguments, the court interrupted defendant's counsel and inquired as follows:

> "How are you going to ask the Court to believe that [defendant's] subjective determination to use a firearm in these circumstances when no firearm was seen— and I understand there's case law that says it doesn't exist—excuse me. There's case law that says it doesn't have to be seen.
>
> But you tell me what evidence you believe that makes me feel and convinces me that [defendant's] subjective belief that his use of deadly force was objectively reasonable. Because I would like to just understand in those contexts or in that context what you believe the evidence fails from the State's perspective or what you think yourself, defense, shows that the State didn't negate in their case."

Defense counsel responded by pointing out that the individuals exited their vehicle in an aggressive manner wearing ski masks and that defendant believed they had a gun. The court asked counsel again to explain what evidence had been presented to support defendant's belief that the masked individuals had a gun.

¶ 20    The court continued the same line of inquiry during Williams's counsel's closing arguments. During the discussion, the court indicated that the evidence had sufficiently established Montgomery and Opiola as the initial aggressors and that Williams subjectively believed his life was in danger. The court further noted during the State's rebuttal that it was unbelievable that Opiola would have taken the time to park perfectly against the curb while attempting to run away from a shooting.

7

¶ 21    After defendant was convicted, the court sentenced him to three concurrent terms of 10 years' imprisonment for his aggravated battery and aggravated discharge of a firearm convictions. Defendant received concurrent sentences of three years' imprisonment for his AUUW conviction and 1 year of imprisonment for possession of firearm ammunition. In so sentencing, the court noted that defendant had no criminal history. Defendant was additionally ordered to pay restitution. Defense counsel did not file an assessment waiver.

¶ 22                                 II. ANALYSIS

¶ 23                          A. Sufficiency of the Evidence

¶ 24    On appeal, defendant first contends that the State failed to disprove his claim that he discharged his firearm in self-defense. As an affirmative defense, once a defendant raises a claim of self-defense, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, in addition to proving the elements of the charged offense. *People v. Gray*, 2017 IL 120958, ¶ 50. The elements necessary to establish self-defense are:

> "(1) unlawful force threatened against a person, (2) the person threatened was not the aggressor, (3) the danger of harm was imminent, (4) the use of force was necessary, (5) the person threatened actually and subjectively believed a danger existed that required the use of the force applied, and (6) the beliefs of the person threatened were objectively reasonable." *Gray*, 2017 IL 120958, ¶ 50.

See also 720 ILCS 5/7-1 (West 2020). If the State negates any one of these elements, a defendant's self-defense claim cannot prevail. *Gray*, 2017 IL 120958, ¶ 50.

¶ 25    As with any other challenge to the sufficiency of the evidence, contentions that the State failed to negate self-defense require the reviewing court to determine, after considering the evidence in the light most favorable to the prosecution, whether any rational trier of fact could

8

have found beyond a reasonable doubt that the defendant did not act in self-defense. *People v. Wilkinson*, 2018 IL App (3d) 160173, ¶ 36. It is not the function of the reviewing court to retry the defendant, as the trier of fact is responsible for determining witness credibility, weighing the evidence, and drawing reasonable inferences therefrom. *People v. Holman*, 2014 IL App (3d) 120905, ¶ 56.

¶ 26    At the outset, we note that the parties dispute whether Williams's statements can be considered as admissible evidence in defendant's case. The record reflects that the court conditionally denied the State's motion to sever once defendants waived their right to a jury trial and a joint bench trial was held. Despite this, the court confirmed with the parties that defendants were being tried separately, albeit simultaneously. When Williams's statements were introduced, defense counsel declined to adopt the statements and agreed to accept the court's ability to discern which statements would be admissible against defendant. It is unclear from the record which of Williams's statements, if any, were found by the court to be admissible against defendant. Regardless of whether Williams's statements were properly admitted as to either defendant, the statements were introduced as evidence at trial and all evidence must be considered when reviewing a challenge to the sufficiency of the evidence. See *People v. Thompson*, 349 Ill. App. 3d 587, 595 (2004).

¶ 27    Although the court found that defendant subjectively believed it was necessary to defend himself and that Montgomery and Opiola were the initial aggressors, it ultimately determined that defendant was objectively unreasonable in his belief that deadly force was necessary because defendant never stated that he saw a gun and no gun linked to either Montgomery or Opiola was ever recovered. However, it is not imperative that the alleged attackers actually be armed for the use of deadly force to be legally justifiable. *People v. Foster*, 81 Ill. App. 3d 915, 922 (1980). Acts

9

of self-defense utilizing deadly force are justified when a person "reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." 720 ILCS 5/7-1(a) (West 2020); *Holman*, 2014 IL App (3d) 120905, ¶ 58. "The decisive question is whether the defendant's belief that it was necessary to use deadly force was reasonable under the circumstances." *Holman*, 2014 IL App (3d) 120905, ¶ 58.

¶ 28     After reviewing the evidence presented at trial in the light most favorable to the State, we conclude that defendant's use of force was objectively reasonable based on the circumstances. Defendant and Williams were approached while walking along the street by unknown individuals wearing ski masks. Because it was summer, it can reasonably be inferred that the individuals were wearing the masks to conceal their identity for nefarious reasons. The masked individuals advanced on defendant and Williams after appearing to intentionally target them by aggressively yelling before stopping and turning their vehicle around to park. The menacing nature of this conduct made it objectively reasonable for defendant to believe that the individuals approaching them may have been armed and intended to cause great bodily harm or death. See *People v. Whiters*, 146 Ill. 2d 437, 444 (1992) (defendant's perception of danger, not actual peril, is dispositive as to reasonableness of defendant's belief that the use of deadly force was justified). Defendant was not required to exercise perfect judgment under this perceived threat, even if he was mistaken. See *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 55; *People v. Shipp*, 52 Ill. App. 3d 470, 477 (1977). Therefore, we find that the evidence was insufficient to disprove defendant's self-defense claim beyond a reasonable doubt and reverse his aggravated battery and both aggravated discharge of a firearm convictions. Accordingly, the circuit court's restitution order is stricken, as restitution cannot be imposed for charges that have been acquitted. See *People v. Clausell*, 385 Ill. App. 3d 1079, 1081 (2008). We need not address defendant's additional

challenges related to these convictions involving Montgomery's prior battery adjudications and the court's consideration of improper sentencing factors.

¶ 29                               B. One-Act, One-Crime Rule

¶ 30        Defendant next argues his convictions for AUUW and unlawful possession of firearm ammunition without a FOID card violate the one-act, one-crime rule. He contends that his convictions are all based on one act because the offenses occurred on the same date, at the same time and location, using the same firearm and ammunition. As a threshold matter, defendant acknowledges the issue was not previously raised in the circuit court, claiming his counsel was ineffective for failing to properly preserve it for appeal. To overcome this forfeiture, defendant seeks plain error review pursuant to Illinois Supreme Court Rule 615(a). The plain error doctrine provides for review of an unpreserved issue:

> "when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

The first step in any plain error analysis requires a determination as to whether an error occurred. *Id.* Because violations of the one-act, one-crime rule adversely affect the integrity of the judicial process, review under the second prong of the plain error doctrine is appropriate. See *People v. Smith*, 2019 IL 123901, ¶ 14.

11

¶ 31 Under the one-act, one-crime rule, a defendant may not be convicted of multiple offenses that are all based on precisely the same physical act. *People v. Coats*, 2018 IL 121926, ¶ 11. Application of the one-act, one-crime rule involves a two-step analysis where the court must first determine whether defendant's conduct constitutes a single physical act or multiple acts. *People v. Brown*, 2018 IL App (3d) 150070-B, ¶ 14. An "act" is defined as "any overt or outward manifestation which will support a different offense." *People v. King*, 66 Ill. 2d 551, 566 (1977). If more than one conviction is predicated on the same physical act, a sentence should be imposed for the most serious offense and the lesser offenses should be vacated. *People v. Artis*, 232 Ill. 2d 156, 170 (2009). Whether a violation of the rule occurred is a matter of law subject to *de novo* review. *Smith*, 2019 IL 123901, ¶ 15.

¶ 32 Here, defendant's remaining convictions for AUUW and unlawful possession of firearm ammunition without a FOID card are predicated on two separate acts. See *People v. Almond*, 2015 IL 113817, ¶ 48 (even when possessed simultaneously, possession of a firearm and possession of firearm ammunition are materially different acts). In coming to this conclusion, we reject defendant's assertion that his conduct must be treated as a single act because the indictment did not allege that the offenses were based on separate acts. The charges clearly demonstrate the State's intent to treat defendant's conduct as separate acts, as one is based on possession of a firearm and the other is based on possession of firearm ammunition. See *id.* ¶ 49 (separate charges based on possession of a firearm and possession of firearm ammunition are indictive of State's intent to treat defendant's conduct as separate and multiple acts). Therefore, defendant's convictions do not violate the one-act, one-crime rule.

¶ 33 C. Ineffective Assistance of Counsel

¶ 34 Finally, the State agrees with defendant's contention that trial counsel provided ineffective assistance by failing to file an assessment waiver (725 ILCS 5/124A-20 (West 2020)). A criminal defendant is entitled to the effective assistance of counsel as a constitutional right. U.S. Const., amend.VI; *Strickland v. Washington*, 466 U.S. 668, 686 (1984). An ineffective assistance of counsel claim regarding sentencing can only prevail if a defendant demonstrates that counsel's performance fell below minimal professional standards, and a reasonable probability exists that the sentence was affected by counsel's deficient performance. *People v. Steidl*, 177 Ill. 2d 239, 257 (1997).

¶ 35 Section 124A-20(b)(1) of the Code of Criminal Procedure of 1963 provides that if a defendant applying for an assessment waiver is found to be indigent, the court must exempt the defendant from payment of any assessments by granting the waiver in full. 725 ILCS 5/124A-20(b)(1) (West 2020). A person is considered indigent under the statute if, in relevant part:

> "(2) His or her available personal income is 200% or less of the current poverty level, unless the applicant's assets that are not exempt under Part 9 or 10 of Article XII of the Code of Civil Procedure are of a nature and value that the court determines that the applicant is able to pay the assessments." *Id.* § 124A-20(a)(2).

¶ 36 Here, defendant met the criteria to qualify for an assessment waiver as the court deemed that he was indigent when it granted his motion to appoint a DNA expert at the county's expense based on his affidavit of assets and liabilities indicating that he had no income or assets. Therefore, counsel's performance was deficient for failing to file an application for an assessment waiver. See *People v. Bradford*, 2024 IL App (3d) 220513-U, ¶ 16. Further, because the record reflects that defendant qualified for the waiver, a reasonable probability exists that he would have been

exempt from the imposed assessments if counsel had filed the application. Accordingly, we remand the matter to afford defendant the opportunity to file an assessment waiver.

¶ 37                                   III. CONCLUSION

¶ 38            The judgment of the circuit court of Will County is affirmed in part, reversed in part, and remanded for further proceedings.

¶ 39            Affirmed in part, reversed in part, and remanded.